Norbert T. UNGAR, Petitioner,

v.

**DISTRICT OF COLUMBIA RENTAL HOUSING COMMISSION,**
Respondent,

Frances Abdemoulaie, Intervenor.

No. 85–1070.

District of Columbia Court of Appeals.

Reargued Sept. 11, 1987.[1]
Decided Dec. 31, 1987.

---

**1.** The decision in this case originally was released as a Memorandum Opinion and Judgment on January 8, 1987. Intervenor's motion for reconsideration and rehearing on attorney's fees was granted. Argument was heard on that issue and is discussed in Part III, *infra*.

Norbert T. Ungar, pro se.

Beverly J. Burke, Asst. Corp. Counsel, with whom John H. Suda, Acting Corp. Counsel at the time of the initial argument, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for respondent.

Peter Drymalski, Silver Spring, Md., for intervenor.

Before PRYOR, Chief Judge, and FERREN and ROGERS, Associate Judges.

PER CURIAM:

Norbert T. Ungar, a landlord, petitions for review of the District of Columbia Rental Housing Commission's (the "Commission") decision to affirm a determination by the District of Columbia Rental Accommodations Office (the "Office")[2] that petitioner's rental units exhibited numerous Housing Code violations and that a rental increase agreement obtained by petitioner, purportedly pursuant to D.C.Code § 45–1526 (1981); 35 DCMR § 3512, was void because it was obtained by fraud, misrepresentation, and coercion. In addition, the Commission affirmed the hearing examiner's order to roll back rents to their March 1980 levels, to refund all rents collected above that level with treble damages and interest, and to pay attorney's fees. We affirm and award additional attorney's fees incurred in the appellate court.

### I

Petitioner Ungar is the landlord and co-owner of the Randle Terrace Apartments (the "Apartments"), a forty-unit apartment building located in the District of Columbia at 2525 Minnesota Avenue, S.E. On July 30, 1982, Mr. Ungar obtained approval from the Office to implement a rent increase of 34% at the Apartments. The approval was based on documents that Mr. Ungar submitted to the Office purporting to show that more than 70% of the tenants

---

**2.** The District of Columbia Rental Accommodations Office is currently known as the Rental Accommodations and Conversion Division.

had consented to the increase. The increase was implemented on September 1, 1982.[3]

On August 31, 1983, Frances Abdemoulaie, a tenant at the Apartments who did not sign the rental increase agreement, filed Tenant Petition No. 11,142 contesting the validity of the increase as well as of all the rental increases at the Apartments since 1978. The petition alleged that the rent increases were invalid because (1) Mr. Ungar was not the authorized agent of his co-owners, (2) he failed to file proper rent increase forms, (3) the 1982 increase agreement was obtained by fraud, (4) the premises contained substantial housing code violations, and (5) 70% of the actual tenants did not sign the agreement. A hearing on the matter began on February 16, 1984 and continued through June 4, 1984. On October 1, 1984, the hearing examiner issued a decision and order, based upon an extensive statement of factual findings. Mr. Ungar appealed the hearing examiner's decision to the Commission on October 17, 1984; on July 11, 1985, the Commission affirmed the hearing examiner's determination on all counts relevant to this appeal,[4] thereby invalidating the 70% agreement by the tenants at the Apartments to have all the rents raised by 34%.

3. A so-called 70% increase is permitted by D.C. Code § 45–1526 (1981), which provides:
> If 70 percent of the tenants of a housing accommodation sign an agreement filed with the Rent Administrator to have the rent ceiling for all rental units in the housing accommodation adjusted by a specific percentage, the Rent Administrator shall immediately certify approval of the increase. The agreement shall include ... a statement that the agreement with the landlord was entered into voluntarily without any form of coercion on the part of the landlord of the housing accommodation.

4. The Commission reversed the hearing examiner on the single issue of Mr. Ungar's retaliation against Ms. Abdemoulaie, holding there was no retaliation.

5. The issues of laches, collateral estoppel and standing are raised for the first time in this appeal. Following full briefing by both parties, they were withdrawn at the oral argument on December 9, 1986. It is well-settled that generally we will not reverse an agency decision on an issue that the agency never had a chance to

## II

Mr. Ungar presents this court with nine assignments of error, several of which are raised for the first time in this appeal. Among the nine challenges are: (1) that Ms. Abdemoulaie, the complaining tenant, was barred by the doctrine of laches from pursuing her complaint; (2) that Ms. Abdemoulaie was collaterally estopped from pursuing her complaint in light of *Carey v. Ungar*, TP No. 10,747; (3) that Ms. Abdemoulaie lacked standing to contest the validity of the rental increase agreement because she had not signed the agreement; (4) that the issue of vacancy increases was improperly before the Commission and that there was insufficient evidence to prove Mr. Ungar took excessive increases; (5) that more than 70% of the tenants signed the agreement; and (6) that the hearing examiner's finding that Ungar's registration was defective was incorrect.[5]

### A.

Employing a novel argument, Mr. Ungar's principal contention is that the Commission's decision should be reversed on grounds that he was denied due process when the hearing examiner, acting pursuant to 14 DCMR § 3105, expanded the scope of the hearing without fulfilling the formal notice requirements of § 3105.[6]

consider, *Bealer v. D.C. Rental Housing Commission*, 472 A.2d 901 (D.C.1984), and because the issues were withdrawn, we do not address them here.

6. Section 3105 provides in pertinent part:
> 3105.1 If the hearing examiner determines that the issues raised in a tenant petition affect other tenants or all tenants in the housing accommodation, the hearing examiner may expand the scope of the proceedings to include all affected tenants: Provided, that notice shall be given to the additional tenants that they have the right to participate in the proceedings.
> 3105.2 The notice to other tenants shall state the issues to be decided in the proceeding and that any decision shall be binding upon them.
> 3105.3 The hearing examiner shall also provide notice to the landlord of the determination to expand the scope of the proceeding.
> 3015.4 The notice to the tenants and the landlord must be provided so that they have a reasonable time to prepare and present any arguments in support of or opposition to the hearing examiner's determination.

In its review of Mr. Ungar's due process claim the Commission noted, "[t]he decision was favorable to the tenants and as [Ungar] had not been prejudiced by the decision, we find no harmful error in the examiner's decision to expand the scope of the proceedings or in his failure to notify the tenants pursuant to Commission Regulations." TP No. 11,142 at 3 (DCRHC 7/11/85). We observe that it would be virtually impossible for a landlord to defend against a nonsigning tenant's challenge of the validity of a rental increase agreement pursuant to D.C.Code § 45–1526 without necessarily anticipating that the rights of the remaining tenants would be affected. Due to the nature of the complaint, there was no need for the hearing examiner to "expand the scope of the proceedings." Mr. Ungar does not suggest, nor are we able to find, that the unnotified tenants were prejudiced by the hearing examiner's failure to formally notify them. The notice requirements of § 3105 must be strictly adhered to, since issues with the potential to adversely affect either other tenants or the landlord may lurk initially undetected in a tenant's petition. In the particular circumstances of the instant case, however, we agree with the Commission that even if error could be assigned for the failure of the hearing examiner to notify the landlord and tenants under 14 DCMR § 3105, such failure is harmless error. The hearings lasted more than three months and provided more than an adequate and reasonable time for Mr. Ungar to prepare and present arguments.[7]

## B.

Finally, Mr. Ungar argues that it was error for the hearing examiner to award Ms. Abdemoulaie attorney's fees and that the award of treble damages was unjustified.

The hearing examiner awarded attorney's fees totaling $5,400, one half of the amount requested. Mr. Ungar challenges this award on the ground that the hearing examiner did not explicitly refer to each of the twelve factors adopted by this court in *Frazier v. Center Motors, Inc.,* 418 A.2d 1018, 1025 (D.C.1980).[8] We note that the hearing examiner did explicitly consider many of the factors and that a precise analysis under *Frazier,* utilizing each of the *Frazier* factors, is not required. *Frazier v. Franklin Investment Co.,* 468 A.2d 1338, 1342 (D.C.1983).[9] Moreover, we note that the *Frazier* factors are guidelines for determining the reasonableness of attorney's fees and not for making the threshold determination that attorney's fees should be awarded in the first place. Mr. Ungar does not contest the reasonableness of the fees. Although hearing examiners should articulate in specific detail both the standard employed and the facts relied upon in arriving at a determination of reasonable attorney's fees, we find that in this case, the hearing examiner's state-

7. Mr. Ungar's other challenges are tantamount to asking this court to reverse an administrative agency's findings of fact. Because our review of the record reveals that it is replete with testimony and documentary evidence sufficient to support the findings, *Remin v. D.C. Rental Housing Commission,* 471 A.2d 275 (D.C.1984), we find no error.

8. The twelve *Frazier* factors are: (1) time and labor required, (2) the novelty and difficulty of the question, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to the acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of

the professional relationship with the client, (12) awards in similar cases. *Id.* at 1025.

9. The hearing examiner wrote, "[e]xtensive research and investigation were obviously employed in the presentation of this case.... This case was obviously no frivolous gesture. [Ms. Abdemoulaie] has revealed extensive violations on the part of [Mr. Ungar] and has substantiated the allegations.... Ungar's repeated failure to comply with promised presentation of documents; unnecessary delays by appearing late for hearings; failure to appear; and the necessity to leave hearings early; extended the proceedings unnecessarily. He often acted in bad faith and abused the process resulting in increased legal costs. Because of [Ungar's] conduct, the hearings continued for nine sessions over a four month period." TP No. 11,142 at 22–23.

ment of reasons underlying his decision, in conjunction with the findings supporting those reasons, is a sufficient basis upon which to rest such an award.[10]

■ The concepts controlling treble damages are clear. "Any person who knowingly: (1) Demands or receives any rent for a rental unit in excess of the maximum allowable rent ... shall be held liable ... for the amount by which the rent exceeds the applicable rent ceiling or for treble that amount and/or for a roll back of the rent to such amount as the Rent Administrator or Rental Housing Commission shall determine." D.C.Code § 45–1591(a)(1). *See also Interstate General Corp. v. District of Columbia Rental Housing Commission,* 501 A.2d 1261 (D.C. 1985) (comparing the nondiscriminatory penalty provisions of the 1977 Rental Housing Act with the discretionary penalty provisions of the 1980 Act). The award of treble damages must be based on a showing that the landlord's acts were committed knowingly, willfully, or in bad faith. *Id.* at 1265. That Mr. Ungar was able to secure the approval of the Office for the rental increase agreement does not preclude a finding that he acted knowingly, wilfully, or in bad faith. The agency found that Mr. Ungar's conduct in obtaining the signatures of his tenants was willful and the result of misrepresentation, fraud, and coercion. This finding is supported by substantial evidence of record. Accordingly, we find no error in the award of treble damages. Because we find each of Mr. Ungar's challenges to be without merit, we affirm the decision of the Commission in its entirety.

## III

Ms. Abdemoulaie has asked this court to award attorney's fees incurred in the course of this appellate litigation. We deferred this request pending disposition on the merits.

In general, under the so-called "American Rule," a prevailing litigant is not enti-

tled to collect attorney's fees from the losing party. *In re Antioch University,* 482 A.2d 133, 135–36 (D.C.1984). Where the legislature has specifically provided for the award of attorney's fees, however, such fees may be awarded. *Launay v. Launay, Inc.,* 497 A.2d 443, 450 (D.C.1985). According to D.C.Code § 45–2592 (1981), we may "award reasonable attorney's fees to the prevailing party in any action under this chapter except actions for eviction authorized under § 45–2551."

In this case, Ms. Abdemoulaie was the prevailing party. Mr. Ungar does not question her counsel's proffer, under oath, that he devoted 68.5 hours to the case and that his hourly rate is $60. Furthermore, Mr. Ungar did not file a written opposition to counsel's application for a $4,110 attorney's fee (68.5 × $60) allocable to this appeal, and at oral argument his counsel acknowledged that the hours spent, as well as the hourly rate, were reasonable. Mr. Ungar's only argument against the requested fee is that the applicable statute, D.C.Code § 45–2592 (1981), provides for a discretionary award of attorney's fees, that this court should not exercise its discretion to award fees absent a showing of frivolousness or some other manifestation of bad faith, and that this court's award of $1,000 after the initial hearing of this appeal was an appropriate attorney's fee because it apparently was premised, correctly, on the three frivolous contentions that Mr. Ungar's counsel withdrew at oral argument. *Supra* note 5.

■ Although § 45–2592 does permit a discretionary award of attorney's fees to the prevailing party and thus does not automatically repeal the American rule in this context, it does not, as Mr. Ungar would have it, merely incorporate the "vexatious conduct" exception to the American rule—an exception available in the absence of the statute. *See Tupling v. Britton,* 411 A.2d 349, 352 (D.C.1980) (when appeal is frivolous, court may assess damages in form of appellee's attorney's fees and other rea-

---

**10.** In fact, the findings seem to support an award of an amount greater than $5,400. Since the petitioner does not contest the award of 50%

of his request, we will not interfere with the Commissioner's decision.

sonable expenses). The parties have not referred us to any legislative history, nor have we, ourselves, found any that is informative, but we infer from the statutory scheme that the hearing examiner was correct: the purposes of the attorney's fee provision are to encourage tenants to enforce their own rights, in effect acting as private attorneys general, and to encourage attorneys to accept cases brought under the Rental Housing Act of 1980. Accordingly, we conclude that § 45–2592 creates a presumptive award of attorney's fees to the prevailing party—which may be withheld, in the court's discretion, if the equities indicate otherwise.

We also conclude that the fee shall be computed as in *District of Columbia v. Hunt (Hunt II)*, 525 A.2d 1015, 1016 (D.C.1987) (quoting *Hoska v. United States Department of the Army*, 224 U.S.App. D.C. 150, 155, 694 F.2d 270, 275 (1982)):

> [T]he attorney's fee is computed by first determining the 'lodestar,' *i.e.*, the number of hours reasonably expended multiplied by a reasonable hourly rate. The lodestar fee may then be adjusted up or down to reflect the quality of representation and the contingent nature of success.[11]

*Hunt II* articulates the fee analysis differently from the twelve-factor approach we announced in *Frazier*, which was the law in 1984 when the hearing examiner awarded the attorney's fees that we have sustained for the proceeding before the Commission. *Hunt II*, however, is a rearticulation and refinement of *Frazier*, not a new concept. *Hunt II* reflects a trend originating in the federal circuit courts of appeal, which "have incorporated the twelve factors into an analytical framework that can easily be applied by the trial courts and that will make possible meaningful appellate review." *Copeland v. Marshall*, 205 U.S. App.D.C. 390, 400, 641 F.2d 880, 890 (1980) (en banc).[12]

In this case, we perceive no basis for declining to exercise our discretion in favor of an award to Ms. Abdemoulaie; the record affords Mr. Ungar no equitable argument that could defeat her presumptive right to attorney's fees for successfully defending her position on appeal. Furthermore, Mr. Ungar has conceded that the hours and hourly rate submitted are reasonable. It follows that the "lodestar" fee of $4,110 is reasonable within the meaning of § 45–2592, absent any required adjustment. Under the circumstances, no adjustment is indicated. Accordingly, Ms. Abdemoulaie's motion for attorney's fees of $4,110 on appeal is granted.

*So ordered.*

---

11. *Hunt II* addressed a requested award of attorney's fees under the federal Backpay Act, 5 U.S.C. § 5596(b)(1)(A)(ii) (1982), which mandates an award of reasonable attorney's fees to an employee who is held entitled to back pay because of an "unjustified or unwarranted personnel action" that had resulted in the "withdrawal or reduction" of compensation. *See Hunt II, supra*, 525 A.2d at 1016; *District of Columbia v. Hunt (Hunt I)*, 520 A.2d 300 (D.C. 1987). The fact that attorney's fees for a prevailing employee are mandatory under the Backpay Act, rather than discretionary, as in the present case, does not affect how the fee should be calculated. The "lodestar" approach is proper whether the statutory fee is a matter of legislative entitlement or of court discretion.

12. Our successive decisions in *Frazier v. Center Motors, Inc.*, 418 A.2d 1018 (D.C.1980) and *Hunt II*, parallel decisions from the United States Court of Appeals for the District of Columbia Circuit. In *Frazier, supra*, 418 A.2d at 1025, we adopted the approach in *Evans v. Sheraton Park Hotel*, 164 U.S.App.D.C. 86, 503 F.2d 177 (1974). Six years later, in *Copeland v. Marshall*, 205 U.S.App.D.C. 390, 641 F.2d 880 (1980) (en banc), the circuit court announced a new "analytical framework" within which to consider the *Evans* factors. In *Hunt II, supra*, 525 A.2d at 1016, we followed the approach of *Copeland* and thereby refined *Frazier*, as we had previously done in *Henderson v. District of Columbia*, 493 A.2d 982 (D.C.1985).

Interestingly, the federal circuit court, sitting en banc in *Copeland*, affirmed the attorney's fee award which the district court had ordered after applying the *Evans* factors. *See Copeland, supra*, 205 U.S.App.D.C. at 398, 641 F.2d at 888. Thus, in *Copeland*, the circuit court illustrated that the newly-adopted approach based on the lodestar, subject to adjustment up or down, was essentially a method for applying the twelve *Evans* factors, which "remain central to any fee award." *Id.* at 399, 641 F.2d at 889 (footnote omitted).