## GENERAL FEDERATION OF WOMEN'S CLUBS, Appellant/Cross–Appellee,

v.

## IRON GATE INN, INC. and John Saah, Appellees/Cross–Appellants.

### Nos. 86–811, 86–900.

District of Columbia Court of Appeals.

Argued Nov. 19, 1987.
Decided Feb. 18, 1988.

---

Ronald L. Plesser, with whom Alan R. Schwartz, Washington, D.C., was on the brief, for appellant.

David J. Frantz, Washington, D.C., for appellees.

Before PRYOR, Chief Judge, and FERREN and BELSON, Associate Judges.

FERREN, Associate Judge:

This case arises from an ongoing dispute between appellant General Federation of Women's Clubs (GFWC), a landlord, and its tenant, appellee Iron Gate Inn, Inc., a restaurant owned by appellee John Saah. Three issues are presented in this appeal: first, whether the trial court properly awarded attorneys' fees to the Inn and Saah for defending the contempt proceeding that GFWC brought against them; second, whether the trial court properly denied appellees' request for the additional fees incurred in the successful effort to recover their fees for the contempt proceeding; and, third, whether the court properly calculated the amount of fees awarded. We conclude that the trial court properly awarded appellees their fees for defending the contempt proceedings. We also hold, however, that the trial court erred in finding itself without discretion to award appellees the fees they incurred in the fee recovery proceeding itself. Finally, we conclude that the trial court applied an appropriate formula in calculating the amount of fees awarded. Accordingly, we affirm in part, reverse in part, and remand to the trial court for consideration of appellees' request for the fees incurred in recovering their fees for the contempt proceeding.

### I.

To understand the present fee dispute, it is necessary to understand the history of the underlying lawsuit. Appellee Iron Gate Inn, Inc., is a tenant at 1743 N Street, N.W., on premises owned by appellant GFWC. The premises consist of a converted stable, courtyard, and covered breezeway located between and behind two adjacent townhouses owned by GFWC. The offices of GFWC are in the townhouses; the Inn uses the stable, courtyard, and breezeway to serve its restaurant patrons. The Inn has been a tenant of GFWC since 1958, when the Inn was operated by appellee Saah's father. Saah himself has operated the Inn since 1969. The most recent lease for the premises was executed in 1975 and is due to expire in 1990.

In 1981, apparently for the first time, GFWC objected to the Inn's use of the breezeway between the two townhouses to serve the restaurant's customers and to store firewood. When GFWC raised its objection, Saah refused to alter his use of the breezeway, believing himself entitled to that use under the 1975 lease. GFWC responded by filing a complaint against Saah and the Inn for trespass and breach of contract, seeking damages and injunctive relief. Saah and the Inn counterclaimed for breach of quiet enjoyment.

GFWC's claims for trespass, breach of contract, and permanent injunctive relief were tried before Judge Graae in April 1983.[1] John Saah testified on behalf of the Inn that the breezeway had been used to serve patrons and to store firewood since at least 1969. The Inn also offered the testimony of six disinterested witnesses, each of whom stated that he or she had seen the breezeway used to serve patrons or to store firewood before 1981. A number of GFWC officers, past and present, gave testimony to the contrary; they testified that the Inn had never used the breezeway for those purposes before 1981. The trial court was unpersuaded by the testimony of GFWC's witnesses; it found that, at least since 1970, Saah had located tables, chairs, and various decorations in the breezeway during the summer months and had placed firewood there during the winter—all without complaint by GWFC. In May 1983, the trial court issued an order rejecting all of GFWC's claims and permitting Saah and the Inn to continue the Inn's use of the breezeway to serve patrons and to store firewood. The court specifically stated:

> The Court is convinced that the testimony of [GFWC's] witnesses does not accurately describe what has occurred in the [breezeway] for the past fifteen years or so. In fact, it is virtually impossible for the Court to believe that [GFWC's] officers did not at all times know that the restaurant was using the [breezeway] as a dining area during the summer months and as a place for storing firewood during the winter. Indeed, if they did not know (which the Court does not believe), they certainly were in a position to know, and, thus, should have known, given the open and visible use [the Inn] made of the [breezeway] over so many years.

The May 1983 order also clarified the rights of the parties under the lease, confirmed the Inn's entitlement to a parking space, ordered the Inn not to locate tables and chairs in such a way as to interfere with ingress to or egress from GFWC's buildings or the fire escape, and ordered both parties to refrain from parking at the entrance to the breezeway. Finally, the order commanded that neither party interfere with the rights of the other under the lease.

One month later, in June 1983, GFWC repainted the lines demarcating the parking spaces at the rear of the building. In doing so, GFWC altered the parking configuration; whereas two cars had previously fit in a single painted lane, now only one car fit. Shortly thereafter, GFWC complained for the first time about the Inn's practice of parking two cars in its one allotted space.

In July, GFWC filed a motion for contempt against the Inn and Saah based, in part, on the Inn's practice of using its

---

1. The Inn's counterclaim was severed and is still pending. It is not at issue in this appeal.

parking space to park two cars.[2] The contempt motion also cited four other alleged violations of the May 1983 order: tables and chairs had been placed under a fire escape; tables and chairs had been placed near a stairway, interfering with ingress and egress; tables and chairs had been placed near a side exit, interfering with access to a door; and the Inn or its employees had locked a door between the courtyard and the parking lot.

In November 1983, GFWC filed an additional set of contempt charges against Saah and the Inn, alleging a violation of the court's order when the Inn had used GFWC's water to wash cars in the parking lot. In December 1983 and February 1984, GFWC filed still two more contempt charges, alleging untimely payment of rent and other bills, as well as the Inn's failure to remove a mechanic's lien of approximately $850.

The trial court scheduled a hearing on the contempt motion for March 22, 1984. On March 7, counsel for GFWC wrote to the Inn's counsel outlining the eight separate contempt charges that GFWC intended to pursue. On March 20, however, two days before the scheduled hearing, GFWC informed the Inn that the contempt motion would be withdrawn. The hearing was postponed. On March 27, GFWC filed a motion to withdraw its contempt motion without prejudice and requesting, in the alternative, a continuance. The Inn and Saah opposed the motion to withdraw without prejudice and moved, instead, for dismissal of the contempt motion with prejudice. The court denied GFWC's motion, declined to rule on the Inn's motion, and continued the matter to June 28, 1984.

In preparation for the scheduled March hearing on GFWC's contempt motion, the Inn and Saah had deposed four GFWC officers. When the March hearing was postponed, the Inn and Saah requested that discovery be closed. GFWC, however, opposed their request. The parties then filed additional discovery motions. At the time

the contempt motion was heard on June 29, 1984, GFWC added two more charges: occasions in May when the Inn allegedly had parked a car improperly and had placed a chair so as to obstruct the door to the parking lot.

At the hearing, the trial court refused to consider four of GFWC's charges, ruling that they were beyond the scope of the May 1983 order and thus could not serve as a basis for contempt. The court dismissed three more of GFWC's charges as unsubstantiated at the close of GFWC's case. When the Inn began the presentation of its case, only two of GFWC's original charges remained before the court. These related to the Inn's alleged obstruction of a stairway and certain alleged fire safety violations. An officer of GFWC conceded, on examination, that no more than a quarter of the stairway had ever been obstructed; thus, access to the stairway had never effectively been blocked. Furthermore, a fire safety expert testified on behalf of the Inn that none of the violations charged by GFWC presented any fire safety concern. Accordingly, at the close of the Inn's case, the last two contempt charges—the only charges that had survived GFWC's presentation—were dismissed.

After the contempt hearing, both parties filed briefs on the question of how the lease provisions with respect to the parking space ought to be interpreted. The Inn and Saah at that time also briefed their claim for costs, including attorneys' fees, incurred in defending GFWC's contempt motion. On January 17, 1985, the trial court issued an order addressing the parking space question, as well as the attorneys' fees issue.

The January 1985 order stated, with respect to the parking space dispute:

> It strikes the Court as significant that this [the parking space] did not become an issue until well after the Court's May 18th Order when [GFWC] painted new lines of demarcation in the parking lot

2. About the same time, GFWC also filed a motion for summary judgment on the Inn's counterclaim. The court denied the motion.

restricting [the Inn] to parking for one car.

Furthermore, the court found that:

[GFWC's] own pleadings, correspondence by [GFWC's] prior counsel, and testimony by [GFWC's] witnesses on deposition by affidavit, and at trial *all* support [Saah's and the Inn's] interpretation and directly contradict [GFWC's] later argument that "one parking space" means parking for one car.

(Emphasis in original.) The order then amended the court's May 18, 1983 order to provide that "Defendants [Saah and the Inn] are entitled to one parking space, large enough to park two cars...."

On the issue of attorneys' fees, the January order began by reiterating that "the Court denied [GFWC's] motion for contempt, finding *no basis whatever in the evidence to support it.*" (Emphasis added.) The order went on to say:

The issue before this Court, then, is whether [GFWC's] actions in initiating and presenting the contempt motion rose to the level of 'bad faith, or obstinate, unjust, vexatious, wanton, or oppressive conduct' so as to justify awarding counsel fees to [Saah and the Inn]. *The Court has no difficulty in so finding.*

(Emphasis added.) Accordingly, the court awarded costs and attorneys' fees to the Inn and Saah for the expenses incurred in litigating and defending GFWC's contempt motion. The order directed the parties to "negotiate, in good faith, the amount of such costs and fees."

On April 10, 1986, the trial court issued yet another order, finding that the parties had been unable to negotiate a fee settlement and ordering GFWC to pay to Saah and the Inn $68,682.98. In support of its order, the court provided fifteen pages of findings and analysis detailing the basis for the court's calculation. The Inn and Saah had sought an award of $103,163.75 in attorneys' fees and $9,301.85 in other costs, plus interest and an award of an as-yet-un-

determined amount for the services of the attorney who represented the Inn in the presentation of their attorneys' fees claim (commonly called "fees on fees"). The court, while granting the bulk of the Inn's fee request, discounted the award for several reasons. First, the court found that, although the rate of compensation claimed was the customary billing rate of the firm which had rendered services to the Inn and Saah during the contempt proceeding, the firm had, in fact, billed the Inn at a lower rate. Thus, the order awarded only the fees actually paid by the Inn, not the full fees requested. Furthermore, the court disallowed fees for discovery which the court found had been primarily undertaken not in defense of the contempt charges but, rather, in preparation of the Inn's counterclaim. Finally, the court concluded that it could not lawfully exercise discretion to award fees for services rendered in the presentation of the Inn's attorneys' fees claim.[3]

Appellant GFWC now contends the trial court erred in awarding any fees. Appellant also argues that, even if a fee award was appropriate in this case, the amount of fees awarded was excessive. Appellees Saah and the Inn contend, on cross-appeal, that the trial court erred in concluding it had no discretion to award fees on fees. We address each contention in turn.

## II.

It is well established in this jurisdiction that the so-called "American rule," under which each party bears his or her own litigation costs and attorneys' fees, applies in all cases unless one of a few limited exceptions comes into play. *See Launay v. Launay, Inc.,* 497 A.2d 443 (D.C.1985); *In re Antioch University,* 482 A.2d 133 (D.C. 1984). Here, the trial court invoked the "bad faith" exception. That exception permits the court, in its discretion, to order a litigant to pay the costs and related fees

---

**3.** Appellant suggests in its brief that the trial court exercised its discretion in declining to award appellees fees on fees. The plain language of the trial court's order, however, belies appellant's contention. The order states clearly:

"Defendants cite no authority, and the Court knows of none, for the proposition that the expense of Mr. Frantz's services [counsel for the attorneys' fees motion] should be borne by GFWC."

incurred by another litigant if the first party's conduct has been so egregious that such fee shifting is warranted as a matter of equity. More specifically, this exception permits an award of attorneys' fees to the prevailing party if the other party " 'has acted in bad faith, vexatiously, wantonly, or for oppressive reasons....' " *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975) (quoting *F.D. Rich Co. v. United States,* 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974)) (citations omitted). Thus, the question is whether GFWC's conduct rose to the level of bad faith warranting the imposition of a fee award in derogation of the American rule.

The bad faith exception "applies only in extraordinary cases." *Launay,* 497 A.2d at 450 (citing *Andrews v. District of Columbia,* 443 A.2d 566, 569 (D.C.), *cert. denied,* 459 U.S. 909, 103 S.Ct. 216, 74 L.Ed. 2d 172 (1982)). "Unlike other exceptions to the American rule, which are primarily designed to encourage or to compensate worthy litigants, the bad faith exception is intended to punish those who have abused the judicial process and to deter those who would do so in the future." *Synanon Foundation, Inc. v. Bernstein,* 517 A.2d 28 (D.C.1986). As stated in *Synanon:*

> [T]he court must scrupulously avoid penalizing a party for a legitimate exercise of the right of access to the courts. 'A party is not to be penalized for maintaining an aggressive litigation posture, nor are good faith assertions of colorable claims or defenses to be discouraged.'

*Id.* at 37 (quoting *Lipsig v. National Student Marketing Corp.,* 214 U.S.App.D.C. 1, 3–4, 663 F.2d 178, 180–81 (1980) (per curiam)). Furthermore, attorneys' fees may be assessed only for the portion of the litigation that was conducted in bad faith.

> [T]he conduct which would justify an award of bad faith attorneys' fees may be found either in the filing of a frivolous claim or in the manner in which a properly filed claim is subsequently litigated.

> The measure of the fee award differs depending on which is the case. Bad faith attorneys' fee awards are limited to payment for work and expense attributable to the guilty party's bad faith endeavors.

*Id.* at 38 (citations omitted). Therefore, if the action itself was brought in bad faith, fees for the entire proceeding may be awarded. *Id.* If, however, the claim was filed in good faith, and bad faith arose only at a later point in the litigation, " 'an award of attorneys' fees should be limited to those expenses reasonably incurred to meet the other party's groundless, bad faith procedural moves.' " *Id.* at 38–39 (quoting *Browning Debenture Holders' Committee v. DASA Corp.,* 560 F.2d 1078, 1089 (2d Cir.1977)).

In this case, the trial court found that there was bad faith in the filing of the contempt motion and, thus, that the proceeding was tainted from the outset. We set forth in *Synanon* the test for determining whether an action has been brought (as opposed to later litigated) in bad faith:[4]

> "An action is brought in bad faith when the claim is entirely without color and has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons."

*Id.* at 40 (quoting *Browning Debenture Holders' Committee v. DASA Corp.,* 560 F.2d at 1088). To determine whether a claim is colorable, we consider whether the claim has " 'some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim.' " *Id.* (quoting *Nemeroff v. Abelson,* 620 F.2d 339 (2d Cir.1980) (per curiam)).

■ The trial court's findings, based on the record, sustain a conclusion that GFWC's contempt motion was without col-

---

4. Although *Synanon* was decided after Judge Graae issued his order in this case, we relied in *Synanon* upon well-established precedent that was available to the parties at the time this case was filed. *See, e.g., Browning Debentures Holders' Committee v. DASA Corp.,* 560 F.2d 1078 (2d Cir.1977). Judge Graae in effect applied that precedent; thus, we have no difficulty applying *Synanon* to this case.

or because it lacked, from the outset, the required factual and legal support. GFWC eventually presented ten separate allegations in support of its contempt motion. The trial court dismissed four of these charges because they were beyond the scope of the court's May 1983 order and thus could not form a basis for contempt. GFWC, represented by competent legal counsel, knew or should have known that those charges did not have the requisite legal support. Similarly, GFWC knew or should have known that it lacked factual support for the three additional charges which the trial court dismissed at the close of GFWC's case. Specifically, GFWC's own security officer testified that the Inn lacked the requisite means to commit at least one of the alleged violations, since the Inn did not possess a key to the door that GFWC claimed the Inn had locked. And, with respect to GFWC's allegations that the Inn had placed a chair in such a way as to block a door, and a table so as to block a stairway, the trial court noted that GFWC had failed to present a single witness who had attempted to use the door or the stairs but had not been able to do so. Next, the two allegations that survived GFWC's case were easily refuted by the testimony of the Inn's witnesses.

The trial court denied GFWC's contempt motion, eventually declaring that the court had found "no basis whatever in the evidence to support it." The parking lot issue, which GFWC alleged as an additional basis for its contempt motion and which the trial court held over for consideration after the contempt hearing, also lacked any factual or legal support. As the trial court found, there was no dispute over parking until, after the court's May 1983 order, GFWC changed the status quo by repainting the lines of demarcation.

■ We turn, then, to the second part of the *Synanon* test: whether GFWC's contempt claim was asserted "wantonly, for purposes of harassment or delay, or for other improper reasons." *Synanon,* 517 A.2d at 40. It is difficult to imagine a case in which a claim wholly without color could be asserted without an improper motive.

Even assuming, however, that such a case exists, this is clearly not it. The trial court, in its January 1985 order, commented: "It is noteworthy that Ms. Juanita Bryant, former president of the General Federation of Women's Clubs, stated at the contempt hearing that she would not drop the contempt proceeding, unless the defendants withdrew their counterclaim." While trading the dismissal of one claim for the dismissal of another may be a legitimate settlement tactic in some cases, the trial court here found that GFWC's motion amounted to "a rear guard action of harassment aimed at inflicting severe financial punishment on the Inn." The trial court stated in its order awarding appellees attorneys' fees:

> There is no doubt in the Court's mind that plaintiff was engaged in an action of harassment and that its persistent pursuit of weak, spurious, or irrelevant claims was "obstinate, unjust, vexatious and oppressive." The judicial process was abused here. The abuser should pay the attorneys' fees and costs of the abused.

We will disturb the trial court's order only if we determine that the court abused its discretion. *See Johnson v. United States,* 398 A.2d 354, 362 (D.C.1979). We perceive no abuse of discretion here. Appellees are entitled to their costs and fees for the entire contempt proceeding.

### III.

■ The Inn and Saah contend, on cross-appeal, that the trial court erred in concluding it had no discretion, absent bad faith by GFWC in the course of the fee recovery proceeding, to award appellees the reasonable expenses they incurred in their successful effort to recover their costs, including attorneys' fees, in the contempt proceeding. We agree. The law is well established that, when fees are available to the prevailing party, that party may also be awarded fees on fees, *i.e.,* the reasonable expenses incurred in the recovery of its original costs and fees. *Copeland v. Marshall,* 205 U.S.App.D.C. 390, 406 & n. 29, 641 F.2d 880, 896 & n. 29 (1980) (en banc) ("[T]ime spent litigating the fee re-

quest is itself compensable...."). [5] Bad faith in the litigation of the underlying action is sufficient to support shifting the costs of the fee recovery proceeding itself; no separate showing of bad faith in the recovery proceeding is required. *See, e.g., Synanon*, 517 A.2d at 42. In *Synanon*, we approved without discussion the awarding of expenses incurred in the assessment of the underlying attorneys' fee award. [6] Consistent with our opinion in that case, we conclude the trial court erred in finding itself without discretion to award to the Inn and Saah the expenses arising out of their successful effort to recover fees from GFWC. We note, however, that although the trial court has discretion to award appellees the expenses incurred in pursuing the original fee award, the court is not required to do so. Accordingly, we remand with instructions for the trial court to determine, in its discretion, whether appellees shall be awarded the reasonable costs, including attorneys' fees, they incurred in recovering their fees from GFWC in the contempt proceeding.

## IV.

■ There remains the question whether the amount of the fees the trial court awarded to appellees was excessive. We recently addressed the appropriate method for calculating an award of attorneys' fees in *Ungar v. D.C. Rental Housing Commission*, 535 A.2d 887 (D.C.App.1987). Although *Ungar* concerned a statutory exception to the American rule, the statutory exception in that case—like the bad faith exception in this case—makes the award of costs, including attorneys' fees, discretionary. *See, id.*, at 891; D.C.Code § 45–2592. Thus, we perceive no reason why the *Ungar* formula should not also apply when the bad faith exception is invoked. In *Ungar*, we held that the appropriate formula for calculating an award of attorneys' fees should begin with calculation of the "lodestar," that is, the number of hours expended multiplied by a reasonable hourly fee. *Ungar*, at 892. The lodestar should then be adjusted, as appropriate, with reference to a variety of factors to reflect " 'the quality of representation and the contingent nature of success.' " *District of Columbia v. Hunt (Hunt II)*, 525 A.2d 1015, 1016 (D.C.1987) (quoting *Hoska v. United States Department of the Army*, 224 U.S. App.D.C. 150, 155, 694 F.2d 270, 275 (1982)). The trial court in this case, although ruling before our decision in *Ungar*, nonetheless properly applied the same factors we approved in *Ungar*. The court evaluated the total hours claimed by appellees to determine the actual number of hours spent in defense of the contempt motion, multiplied the resulting total by the actual, reasonable hourly rate charged, and thus arrived at a lodestar figure. The trial court did not adjust the lodestar figure, but no adjustment is required unless the court, in its discretion, determines that some adjustment is indicated. *See Ungar*, at 892. The trial court's calculation comports with our directive in *Ungar* and we will not disturb the resulting award. Moreover, if the trial court, on remand, awards fees on fees, the *Ungar* formula will be applicable.

---

5. An exception to this general rule appears in so-called "common fund" fee cases. Time spent litigating the fee issue may not be compensable in class action "common fund" cases where the fee is to be paid from the fund recovered on behalf of the plaintiff class. The policy considerations, however, which prevent payment of fees on fees in that context are not present where, as here, fees have been awarded under the bad faith exception to the American rule. Because fees under the bad faith exception are assessed against the adversary and do not come from the attorneys' own clients' recovery, the "common fund" prohibition on fees for the fee recovery proceeding has no relevance here. *See Copeland v. Marshall*, 205 U.S.App.D.C. 390, 415 n. 57, 641 F.2d 880, 905 n. 57 (1980) (in "common fund" cases, contest is one between successful plaintiffs and their attorneys over division of the recovery).

6. Specifically, we held:
   For the period beginning January 18, 1980, and continuing up to the dismissal of the complaint, we conclude that all attorneys' fees incurred in defending this litigation were properly included in the award. So too were the later expenses incurred in the assessment of the attorneys' fee award.
   *Synanon Foundation, Inc. v. Bernstein*, 517 A.2d 28, 42 (D.C.1986).

We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

*So ordered.*