**TENANTS OF 2301 E STREET, N.W., Petitioner,**

v.

**DISTRICT OF COLUMBIA RENTAL HOUSING COMMISSION, Respondent.**

**Columbia Plaza Limited Partnership, Intervenor.**

**No. 89–727.**

District of Columbia Court of Appeals.

Argued May 2, 1990.
Decided Sept. 12, 1990.

---

James P. McGranery, Jr., Washington, D.C., for petitioner.

Charles L. Reischel, Deputy Corp. Counsel, and Herbert O. Reid, Sr., Corp. Counsel, Washington, D.C., filed a Statement in Lieu of Brief, on behalf of respondent.

Vincent Mark J. Policy, Washington, D.C., with whom Roger T. Scully, Bethesda, Md., was on the brief, for intervenor.

Before FERREN and SCHWELB, Associate Judges, and REILLY, Senior Judge.

SCHWELB, Associate Judge:

This case had its inception in a dispute over relatively minor repairs to roofs which also serve as patios, and over the effect of such repairs on rent ceilings. It requires us to delve into the mysteries of agency procedure and the scope of judicial review thereof, the reach of the "private attorney general" doctrine, the perils of retroactivity, and that most familiar chestnut of the connoisseur of Rental Housing Act litigation, the *Ungar* presumption.[1]

Intervenor Columbia Plaza Limited Partnership (the landlord) filed a capital improvement petition pursuant to D.C.Code § 45–2520 (1986), requesting that the rent ceiling of four apartments at 2301 E Street, N.W. be increased by $40.10 per unit. The hearing examiner dismissed the petition on technical grounds, but denied the tenants' counter-request for a reduction in the rent ceiling and for penalties and counsel fees. On the tenants' appeal, the District of Columbia Rental Housing Commission affirmed the hearing examiner's ruling.

The tenants now ask this court to review the Commission's order, contending that the denial of relief to them was error. We

---

1. *Ungar v. District of Columbia Rental Hous.* *Comm'n,* 535 A.2d 887 (D.C.1987).

affirm the Commission's decision with respect to the requested rent reduction and penalties, but remand for further proceedings on the issue of counsel fees.

## I

The landlord's petition was based on a claimed need to waterproof the roof and to rehabilitate the roof deck. In October 1986, during the proceedings before the hearing examiner, counsel for the tenants moved to dismiss the petition upon the ground that it had not been signed. The hearing examiner held the motion in abeyance.

The tenants claimed at the hearing that the repairs on which the requested increase in the rent ceiling was based were in reality for the benefit of commercial tenants and had resulted in a reduction of facilities and services to the tenants' units.[2] Specifically, they contended that portions of their apartments had become unusable as a result of the work. At the conclusion of the hearing, the hearing examiner requested (and eventually received) post-hearing submissions with respect to the affected square footage.

In a decision issued in January 1987, the hearing examiner did not address the post-hearing submissions but dismissed the petition on the ground that the filed copy of it was unsigned.[3] He declined to reach the tenants' request for a rent reduction or for

penalties, holding that these issues were not properly before him in a proceeding generated by the landlord's capital improvement petition.[4] The tenants appealed to the Commission. The landlord did not.

On May 8, 1989, the Commission sustained the decision of the hearing examiner. The Commission also denied the tenants' request for counsel fees. In doing so, the Commission cited its own prior decision in *Hampton Courts Tenants' Ass'n v. William C. Smith Co.,* C120, 176 (RHC July 8, 1988), in which it had held that the presumption that prevailing tenants are entitled to an award of counsel fees on a "private attorney general" theory, *see Ungar v. District of Columbia Rental Hous. Comm'n,* 535 A.2d 887, 892 (D.C.1987), does not apply in proceedings initiated by the housing provider. The tenants filed a motion for reconsideration, which the Commission denied on June 1, 1989.

## II

■ The Commission held in its initial decision that the tenants' request for a reduction of rent was not properly before it in the context of a capital improvement petition filed by the landlord. It explained that

[t]he housing provider is not put on notice of any issues not presented in the capital improvement petition. Since the tenants can easily file a tenant petition

---

**2.** It appears that the roofs of the commercial tenants' premises served as patios for the residential tenants' apartments.

**3.** The landlord did not cross-appeal. We think it appropriate, however, to observe that the agency and the hearing examiner might do well to follow our example and "reject the approach that pleading is a game of skill in which one misstep by counsel, [or especially by a *pro se litigant,*] may be decisive as to the result." *Goodman v. District of Columbia Rental Hous. Comm'n,* 573 A.2d 1293, 1300 & n. 17 (D.C.1990) (citations omitted). The landlord could surely have been accorded the opportunity to sign the petition *nunc pro tunc;* there would have been no prejudice to the tenants. Focus on technical defects, to the exclusion of the merits, is particularly inappropriate in proceedings instituted pursuant to a statute such as the Rental Housing Act, which depends largely on lay litigants, operating without legal assistance, to represent

themselves. *Goodman, supra,* 573 A.2d at 1299. Here, the landlord was not represented by counsel before the hearing examiner. Moreover, the deferral of the decision to dismiss on such hyper-technical grounds until after the hearing was over and the post-hearing submissions had been filed led both to the unnecessary expenditure of a substantial amount of time and the accumulation of a large portion of the counsel fees now at issue.

**4.** The hearing examiner held in pertinent part:

If Petitioner's request to have a full evidentiary hearing on the issue of reduction in services is granted, it would violate the notice requirements of the Act. A party must be given notice of any action pending against him before he can be made to defend it. Therefore, the Examiner will not consider any issues other than the one raised in the petition for capital improvements.

with allegations of rent overcharges or, as in this case, reductions in services or facilities, no prejudice attaches to these issues by the failure of the hearing examiner to rule upon them in a capital improvement petition. Additionally, [under the procedure proposed by the tenants] the housing provider cannot allege a violation of the notice requirements of the D.C. Administrative Procedure Act, D.C.Code § 1–1509 (1987 Repl.Vol. 2). Accordingly, the Commission finds no error in the hearing examiner's refusal to consider issues relating to reductions in services and facilities.

The agency relied on its prior decision in *Epstein v. McCampbell*, HP 10,165 (RHC Feb. 12, 1985), in which it had reached the same result where a landlord had filed a hardship petition and the tenants had sought a reduction in the rent ceiling.

We agree with the Commission. The agency's rules contain no provision for counterclaims, and the position for which the tenants contend would compel the landlord to defend a *de facto* counterclaim without prior notice of its contents. As the landlord correctly points out in its brief, there was nothing in the Rental Housing Act, in the regulations promulgated pursuant to it, 14 D.C.M.R. § 4210 (1989), or in the Notice of Hearing served upon the parties in connection with the capital improvement petition, which gave the landlord any notice that the hearing would address possible reductions in the rent ceiling, rather than the increase which the landlord itself was requesting.

The tenants claim that the Commission's capital improvement petition form, which it is the landlord's responsibility to complete, gave the landlord notice that the tenants could make a claim for reduction in services and facilities in conjunction with a capital improvement petition.[5] This contention

founders on its own logic; the landlord cannot be required to give itself notice that the tenants are making a claim against it, nor does the landlord receive notice of the tenants' claim by completing (or not completing) a form prescribed by the Commission.

Moreover, as the agency explained, the form was not designed to elicit the kind of information with which we are concerned here. In its opinion on reconsideration, the Commission held that

the petition form requires information on reduction in services only as they relate to the proposed capital improvement, *i.e.* if the housing provider has been paying the utilities and the capital improvement would make the tenant responsible for the utilities, then the housing provider must show the cost to be deducted from the current rent for no longer providing utilities.

We find this interpretation by the agency of its own form entirely reasonable. We cannot agree with the tenants' contention that the present situation resembles the one posited by the Commission, involving a change from payment of utilities by the landlord to payment by the tenants. The form, as we read the Commission's order, was intended for the situation where the capital improvement by its nature makes a permanent change in the landlord's obligation to the tenant to the tenant's detriment. It was not designed for a scenario, such as the one that allegedly exists here, where work being done on a proposed capital improvement temporarily interferes with a tenant's use of his premises. That type of impairment, as the Commission reasonably held, is properly addressed by a tenant petition.

At argument, counsel for the tenants contended that the reduction in services could be considered as an offset or recoup-

---

5. Section IX of that form reads as follows:
   Where a Housing Provider proposes to increase, decrease or has eliminated the levels of one or more Related Services and/or Facilities, the Housing Provider shall set forth in the space below an estimate of the value of each such service and/or facility to the tenant(s) of the housing accommodation. The estimated value shall reflect both the increased cost and the increased burden the tenant will assume if the service and/or facility is decreased or eliminated. Value estimates should be expressed on an annual basis and on a Per Unit Per Month basis. List each change and its estimated value in the space below.

ment against the landlord's claim. In the present case, however, the landlord received no relief against which any recovery for the tenant could be offset. The Commission's use of a standardized form directed to an entirely different situation did not inaugurate a counterclaim procedure through the back door.

■ Our review of the agency's interpretation of the Rental Housing Act and of its own procedures is deferential. *Winchester Van Buren Tenants Ass'n v. District of Columbia Rental Hous. Comm'n,* 550 A.2d 51 (D.C.1988). Here, the Commission's view that a request to reduce the rent ceiling must be raised in a separate tenant petition, rather than by resort to a *de facto* counterclaim, is neither plainly wrong nor inconsistent with the legislative purpose. *Id.* at 52. We discern no reason to substitute our judgment for that of the Commission with respect to its own procedures. Accordingly, we conclude that the Commission properly denied the tenants a decrease in the rent ceiling.[6]

### III

■ Two weeks before argument in this case, in *Hampton Courts Tenants' Ass'n v. District of Columbia Rental Hous. Comm'n,* 573 A.2d 10 (D.C.1990), this court reversed the Commission's *Hampton Courts* decision, on which the agency had relied in declining to award counsel fees to the tenants. This court concluded that

the Commission's construction of the statute, rejecting the *Ungar* presumption and substituting therefor its own negative presumption, is plainly wrong. We hold that the *Ungar* presumption applies

to prevailing tenants in *both* tenant-initiated and landlord-initiated proceedings. *Id.* at 13. We held, in effect, that a tenant who successfully resists an attempt by the landlord to raise the rent by resort to a capital improvement petition acts as a "private attorney general"[7] in protecting tenants of low or moderate income from unwarranted increases in their rent. *See also Goodman v. District of Columbia Rental Hous. Comm'n,* 573 A.2d 1293, 1297 (D.C. 1990), emphasizing the "quintessentially remedial" character of the Rental Housing Act.

The landlord argues that our *Hampton Courts* decision should be given prospective application only.[8] Specifically, the landlord claims that, in deciding to go forward with its capital improvement petition, it justifiably relied on Commission precedent restricting the private attorney general doctrine to proceedings initiated by tenants. The landlord also says that this court's decision in *Hampton Courts* is a departure from prior law which it could not reasonably have been expected to anticipate. We find both contentions unpersuasive.

The capital improvement petition in this case was filed on July 18, 1986. The landlord claims to have relied on the decision of the Commission in *Hagner Management Corp. v. Rutherford,* T/P 12, 117 (RHC September 8, 1986), for the proposition that the tenants were not entitled to recover their counsel fees. The landlord would surely have required a crystal ball or, to borrow from its counsel's brief, "the gift of prophecy," to rely on a case which was not

---

6. Having sustained the Commission's holding that no claim for reduction of services and facilities was properly before it, we conclude that the hearing examiner was not obligated to make any findings relevant to the alleged right of the tenants to recover penalties against the landlord. Such findings would not have related to any contested issue properly before the examiner.

7. *See, e.g., Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 211, 93 S.Ct. 364, 367–68, 34 L.Ed.2d 415 (1972); *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968).

8. If the landlord's post-argument brief is intended to sugguest that *Ungar* should likewise only be applied to petitions filed after that case was decided, this would be contrary to our disposition of *Hampton Courts* and of *Alexander v. District of Columbia Rental Hous. Comm'n,* 542 A.2d 359 (D.C.1988). In any event, we decline to hold that application of the private attorney general doctrine to tenants seeking to avoid rent increases proscribed by the rent control laws represents some sort of unforeseeable break with a more equitable past. Such a notion blinks at reality.

decided until six weeks after the action which was allegedly taken in reliance upon it. Moreover, this reliance is supposed to have taken place when the landlord was litigating *pro se.*

We likewise cannot agree with the landlord's argument that this court's decision in *Hampton Courts* was a dramatic and unexpected departure from prior law. The question whether the rule enunciated in *Ungar* and in *Alexander v. District of Columbia Rental Hous. Comm'n,* 542 A.2d 359 (D.C.1988), could properly be applied to landlord-initiated proceedings was one of first impression, but the principle that tenants who resist unwarranted increases in their rent should presumptively be compensated for their legal expenses was surely common to all three cases. The purposes of the statutory provision for counsel fees are to encourage tenants to enforce their own rights and attorneys to accept the cases of non-affluent tenants. *Alexander, supra,* 542 A.2d at 360. These goals are promoted by enabling tenants who prevail on the merits to recover their counsel fees, and this is true irrespective of whether the tenants or their landlord initiated the proceedings.

Citing *Mendes v. Johnson,* 389 A.2d 781 (D.C.1978), and *Kelly Adjustment Co. v. Boyd,* 342 A.2d 361 (D.C.1975), the landlord contends that our decision in *Hampton Courts* ought only to be applied prospec-

tively, and not to cases in which appeals were pending when that case was decided. In the present case, however, the tenants had already raised and briefed the very issue decided in *Hampton Courts* before that decision was issued, and we do not think that the retroactivity analysis in *Mendes* and *Kelly Adjustment* was designed to deny the benefits of a change in the law to individuals so situated. These tenants' right to recover counsel fees should not depend on whether *Hampton Courts* was decided before or after this case—a fortuitous matter over which the tenants had no control—when the same issue was raised in both.

Moreover, even if the landlord could overcome this hurdle—and we do not think it can—*Mendes* and *Kelly Adjustment* would be of no avail to it. In *Mendes,* this court overruled precedents which had permitted a landlord to resort to self-help in evicting a delinquent tenant. In *Kelly Adjustment,* collection agency practices which had long been utilized without judicial disapproval had been invalidated by a then-recent decision of this court.[9] Each of these cases thus arose out of a situation in which a party could reasonably have relied on the prior state of the law in planning his or her conduct, and application of the new rules to pending cases would have been inequitable. No such reasonable reliance would have been possible here.[10]

9. *J.H. Marshall & Associates, Inc. v. Burleson,* 313 A.2d 587 (D.C.1973).

10. The landlord also cites *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). In that case, the Court enumerated the following considerations as properly bearing on the question of retroactivity:

first, whether the holding in question decided an issue of first impression whose resolution was not clearly foreshadowed by earlier cases, ... second, whether retrospective operation will further or retard the operation of the holding in question, ... and third, whether retroactive application could produce substantial inequitable results in individual cases.

*Id.* at 88, 102 S.Ct. at 2880 (citations and internal quotation marks omitted). Assuming, *arguendo,* that the present case qualifies under the first consideration—a dubious assumption at best—we conclude that it assuredly founders on the second and third. *See also Reichley v. Dis-*

*trict of Columbia Dep't of Employment Services,* 531 A.2d 244, 251 (D.C.1987), articulating the four criteria to be utilized in determining whether an agency's adjudication announcing a new rule of law should be applied retroactively or prospectively.

The landlord also argues that, if *Hampton Courts* is applied "retroactively," then tenants will be able to reopen cases which have already been closed, apply for counsel fees, and place an administrative burden on the agency. *Cf. Mendes, supra,* 389 A.2d at 791; *Reichley, supra,* 531 A.2d at 251. The tenants counter that the burden would be negligible. In the present case, as we have noted, the request for counsel fees was made during the pendency of the proceedings. Indeed, if this case had been decided a few months earlier, these tenants would have been instrumental in securing a precedent helpful to tenants generally—the classic "private attorney general" scenario. We therefore have no occasion to consider the question whether the

Even if our decision in *Hampton Courts* had overruled prior precedent, which it did not, it is our duty to apply its holding to this case unless equitable considerations require a contrary result. *See United States v. The Schooner Peggy,* 1 Cranch (5 U.S.) 103, 110, 2 L.Ed. 49 (1801) (where there has been a statutory change in the applicable law since the lower court's decision, the reviewing court must apply the law as revised, even though the lower court's decision was rightful when made). *Accord, Bell v. Maryland,* 378 U.S. 226, 231 & n. 2, 84 S.Ct. 1814, 1817 & n. 2, 12 L.Ed.2d 822 (1964). Here, the same eq-uitable considerations which led to the decision in *Hampton Courts,* based on the same remedial legislation, support the invocation of the *Ungar* presumption in the present case. We must therefore follow *Hampton Courts. M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971).[11]

## IV

For the foregoing reasons, the decision of the District of Columbia Rental Housing Commission is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this

rule of *Hampton Courts* may be invoked to assist tenants who made no contemporaneous request but who seek to reopen previously completed proceedings. We intimate no view on that issue, which is obviously different from the one which we are presently called upon to decide.

11. Correctly noting that it was the legislative intent, in enacting the Rental Housing Act, to strike a balance between the rights of landlords and tenants, *see Winchester, supra,* 550 A.2d at 53, and pointing out, *e.g.,* that the 1985 version of the Act restricted treble damage awards to cases in which the landlord acted in bad faith, *see* D.C.Code § 45–2591(a) (1986), the landlord suggests that applying the *Ungar* presumption to the present case is incompatible with that balance. We cannot agree with this conceptualization of the nature of the Act.

"The [rent stabilization] legislation was designed to remedy a critical social evil, namely a severe shortage of rental housing," especially for low- and moderate-income renters, "and it must be accorded a generous construction to achieve its purposes." *Tenants of 738 Longfellow Street, N.W. v. District of Columbia Rental Hous. Comm'n,* 575 A.2d 1205, 1211 & n. 9 (D.C.1990); *Goodman, supra,* 573 A.2d at 1297, 1299. One stated goal of the Act is to provide housing providers and developers with a "reasonable rate of return on their investment." D.C.Code § 45–2502(5). This is primarily achieved by § 45–2522, which deals with hardship petitions and permits landlords to obtain an increase in the rent ceiling if they are not receiving a specified rate of return on their investment. *Tenants of 738 Longfellow Street, supra,* 575 A.2d at 1211 n. 8. The assurance in the statute of a reasonable rate of return does not impair the principle that it should be generously construed.

Rent control is controversial—tenants tend to favor it, while most if not all landlords probably detest it—but the basic goal of the legislation is to protect tenants from impermissibly high rents. The Rental Housing Act forecloses "sophisticated as well as simple-minded" modes of nullification or evasion. *Goodman, supra,* 573 A.2d at 1297. These principles are fundamental to the construction of the Act, and a tenant who successfully resists an unwarranted attempt to raise his and his neighbors' rent furthers the purposes of the legislation, whether the increase is sought by means of an unsuccessful capital improvement petition or in some other way. The balance which the Act was designed to achieve is not upset by recognizing such a tenant's posture as a private attorney general for the purposes of eligibility to recover his counsel fees.

Although the federal Fair Housing Act, 42 U.S.C. §§ 3601 to 3631 (1988), deals with racial and other invidious discrimination rather than economic regulation, it provides an instructive analogy for use of the private attorney general concept. That legislation, too, is balanced. The courts which enforce the Fair Housing Act are required to "minimize federal intrusion and to assure that [landlords] be permitted to retain maximum control of their business operations consistent with the assurance of equal housing opportunities." *United States v. West Peachtree Tenth Corp.,* 437 F.2d 221, 228–29 (5th Cir.1971). Nevertheless, the Act is to be generously construed, *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 211–12, 93 S.Ct. 364, 367–68, 34 L.Ed.2d 415 (1972), and a prevailing plaintiff who seeks to vindicate rights protected by the Act does so not only on his own behalf but also as a private attorney general. *Id.* at 211, 93 S.Ct. at 367–68. The award of counsel fees to a plaintiff pursuant to the private attorney general doctrine, *see* 42 U.S.C. § 3612(c) (1988), is thus deemed to be entirely compatible with, and an acceptable feature of, a balanced remedial statute. *See, e.g., Hairston v. R & R Apartments,* 510 F.2d 1090, 1092–93 (7th Cir.1975); *cf. Fort v. White,* 530 F.2d 1113, 1119 (2d Cir.1976) (role of counsel as acting not only on behalf of his client but also in the interest of others similarly situated cannot be ignored).

opinion on the issue of counsel fees.[12]

*So ordered.*

REILLY, Senior Judge, concurring specially:

While I agree with the disposition of the petition for review and the analysis in Parts I and II of the majority opinion, I regard most of the discussion on the issue of counsel fees in Part III as unnecessary in view of the fact that at the time these proceedings were initiated by the landlord, no administrative ruling on this issue had even been made. Thus, neither party was in a position to claim reasonable reliance on agency precedent when the application for a rent increase based on capital improvements was filed.

Although the recent decision of this court in *Hampton Courts* did not overrule any judicial precedents,[1] I do not regard as unfounded its depiction by the landlord as a departure from prior law, for it not only reversed an administrative ruling, but limited the statutory discretion of the agency to award (or withhold) attorney fees to the prevailing party. Whether or not this case was correctly decided is not a question any division of the court is called upon to discuss. Under our rules, we are bound by it, unless and until it is overthrown by an *en banc* court, subsequent legislation, or a decision of the Supreme Court.[2]

Hence, the majority opinion's attempt to justify *Hampton* on the ground that the attorney fee provision in the District Rental Housing Act is analogous to a corresponding section of the federal Fair Housing Act is superfluous. It may also have a mischievous effect, for the analogy is strained. The federal statute reflects a national policy against racial discrimination. Thus persons aggrieved by such discrimination who retain lawyers to vindicate their rights may well be conceived as acting as private attorneys general. The same can scarcely be said of a local statute which protects wealthy as well as impoverished tenants from the law of supply and demand. As one of the express purposes of the statute is to prevent further erosion of the supply of available rental units, certainly a landlord who expends money to keep the rental structure from deteriorating so badly that it would have to be taken off the rental market is furthering the objectives of the statute.[3] It would then seem to follow that such a landlord is entitled as a "private attorney general" to an award of counsel fees if his lawyer prevails in a contested case in which the tenants unsuccessfully oppose a compensating rent increase. But the notion that the rent control law should receive the same interpretation as statutes forbidding racial discrimination when a counsel fee issue is presented suggests that a landlord has no such entitlement.[4] Surely we should avoid any observation which might lay the groundwork for any such onesided holding. Tenants have no monopoly of virtue, and landlords who promote the purposes of the Act by capital improvements or by maintaining existing units in a high state of repair

---

12. The *Ungar* presumption is a rebuttable one, and the parties are at odds as to whether, on these facts, the presumption has been rebutted. The parties are similarly in sharp disagreement with respect to the question whether, if counsel fees are awardable, the tenants should be compensated even for the portion of their legal expenses relating to what we have found to be their jurisdictionally ill-founded *de facto* counterclaim. We leave these issues for the Commission to address in the first instance. *See* D.C.Code § 45–2592 (1986) (Commission or court may award reasonable attorney's fees to the "prevailing party").

1. *Hampton Courts Tenants' Association v. D.C. Rental Housing Commission*, 573 A.2d 10 (D.C. 1990).

2. *M.A.P. v. Ryan,* 285 A.2d 310 (D.C.1971).

3. D.C.Code § 45–2502(5) (1986 Repl.). In revising the earlier rent control ordinances, the District Council in its 1985 enactment also found, *inter alia,* that the shortage of rental housing was growing because of the withdrawal of housing units from the market and deterioration of existing units. *See id.,* § 45–2501(2).

4. In construing the fee provisions of various civil rights statutes, federal courts have held that successful defendants in suits rejecting claims of discrimination may not require the claimants to pay their legal fees.

should not be denied equal treatment when litigation costs are incurred.[5]

I also regret that the majority opinion did not put to rest the landlord's contention that if *Hampton Courts* is applied here, such "retroactive" application will enable tenants to reopen cases which have already been closed, apply for counsel fees, and place an administrative burden upon the agency. Even granted that *Hampton* announced a new rule of decision, its application to the counsel fee issue in the instant case is not "retroactive," because as the majority points out, the tenants here had made the same claim for fees at the agency level that was asserted by the *Hampton* tenants.

But as *Kelly Adjustment*[6] made clear, judgments which have become final may not be invalidated retroactively so that the losing litigants may take advantage of a new rule of decision. Accordingly, I see no reason for refraining from holding that tenants who made no contemporaneous request for legal fees while their own cases were pending have no standing to return to the Commission and invoke the *Hampton* rule. Plainly, *Hampton* has no impact on cases where no such request was made during the proceedings before the Commission, or if made and rejected, was not raised again in a petition for judicial review challenging the adverse ruling of the agency. It is equally plain that our decision and *Hampton* are applicable to petitions for review currently pending which present the same issue. *See Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).

**5.** The majority opinion cites *Tenants of 738 Longfellow Street v. D.C. Rental Housing Comm.,* for the proposition that rent stabilization legislation "was designed to remedy a critical social evil, namely a severe shortage of rental housing," but ignores the fact that the earlier rent stabilization Act accomplished the very opposite. The Council conceded as much in 1985 by exempting apartment buildings constructed after 1975 from rent control. *See Seman v. D.C. Rental Housing Comm.,* 552 A.2d 863 (D.C.1989).

**6.** *Kelly Adjustment Co. v. Boyd,* 342 A.2d 361 (D.C.1975).