Benson J. FISCHER, et al., Appellants,

v.

ESTATE OF Howard L. FLAX,
et al., Appellees.

No. 01–CV–184.

District of Columbia Court of Appeals.

Argued Nov. 26, 2002.

Decided Jan. 30, 2003.

Barry A. Haberman Washington, DC, argued for appellants; Stanley H. Goldschmidt filed the brief for appellants.

David Schertler, with whom Lisa A.F. Fishberg was on the brief, for appellee Estate of Howard L. Flax.

Frank J. Mastro, Baltimore, MD, with whom Richard J. Magid was on the brief, for appellees Paley, Rothman, Goldstein, Rosenberg & Cooper, Chartered, and Alan S. Mark, Esquire.

Before TERRY and FARRELL, Associate Judges, and BELSON, Senior Judge.

FARRELL, Associate Judge:

Appellants Benson J. Fischer, *et al.* sued Howard L. Flax, the law firm of Paley, Rothman, Goldstein, Rosenberg & Cooper (hereafter Paley Rothman), and Paley Rothman attorney Alan S. Mark for fraud, negligent misrepresentation, tortious interference, and other alleged misconduct arising from a financing transaction with a third party that did not materialize. The trial judge granted summary judgment to Paley Rothman and Mark. On the rescheduled trial date for Fischer's claims against Flax, the judge denied Fischer's renewed motion for a continuance and, when Fischer stated through counsel that he would not proceed in the circumstances, dismissed the complaint with prejudice. The case proceeded to a jury trial on the Flax Estate's counterclaim[1] for *quantum meruit* recovery, resulting in an award of $300,000 in damages. The trial judge then heard testimony on the defendants' joint counterclaim for bad faith litigation, and awarded them collectively some $930,000 in attorney's fees and costs, together with $40,000 in punitive damages.

---

1. Howard Flax had died in the meantime.

On appeal, Fischer challenges the trial judge's grant of summary judgment to Paley Rothman and Mark; his refusal to continue the trial as to Flax and the resulting dismissal; the award of fees for bad faith litigation; and the judge's decision not to recuse himself on Fischer's motion alleging bias. We affirm the judgment in all respects.

## I. Background

In 1995 Fischer, a principal owner of Fischer Brewing Company, needed financing to expand the marketing and production of "Redneck Beer" and related products. He enlisted a friend, Howard Flax, to look for an investor on the understanding, memorialized in a Letter Agreement, that Flax would receive a substantial finder's fee if he succeeded in obtaining financing.[2] In March 1996, Flax sent a letter and promotional package on Fischer's behalf to Laidlaw & Co., an investment banking firm, and that same month Flax, Fischer, and others met with Laidlaw representatives in New York, including Doug Miscoll. Laidlaw liked Fischer's proposal and began assembling a financial package that would include a public stock offering. Laidlaw, of course, was to receive a commission for the deal.

Following the Laidlaw meeting, Fischer was informed by an attorney specializing in securities law that National Association of Security Dealers (NASD) fair practice rules would likely bar Fischer from paying out more than 15% of the gross offering proceeds to Flax and Laidlaw combined. Thus, the payment of 15% in stock to Flax as promised, see note 2, *supra*, would leave *nothing* to compensate Laidlaw. Nevertheless, on the same day Fischer received this advice, Laidlaw (unaware of the compensation agreement with Flax) faxed a draft agreement to Fischer, which he signed.

Knowing he could not make payments under both agreements, Fischer told Flax that he would not pay him the 15% promised, and this led to a series of compromise discussions between the two and their attorneys, each one more contentious than the last. Meanwhile Laidlaw learned of the Fischer/Flax agreement and the obstacle it posed. At about the same time, Laidlaw's Doug Miscoll discovered a letter and a promotional package purportedly sent to Laidlaw by one Howard Reissner on Fischer's behalf dated March 6, 1996— a few days before Flax's initial contact with Laidlaw. Miscoll wrote Flax advising him that Laidlaw would recognize Reissner as the finder and pay him $10,000 if the financing was provided. Negotiations nonetheless continued between Fischer and Flax over a reduced compensation agreement, but without success. Laidlaw eventually withdrew its financing offer to Fischer, in large part because the public demand for brewery stocks had declined. Blaming Flax and his attorney Alan Mark of Paley Rothman for the loss of the Laidlaw deal, Fischer then brought this suit.

In the complaint, Fischer alleged numerous torts all resting on the factual allegations that (1) Howard Flax, aided and abetted by Paley Rothman, had misrepresented to Fischer that he had extensive experience in initial public stock offerings and was a licensed broker-dealer, as well as the fact that a finder's fee of 15%

**2.** The Letter Agreement stated:
In the event [Fischer Brewing Co.] closes either a public/private stock offering, debt financing or sale, or any combination thereof ... with any ... underwriter introduced to the Company by [Flax], [Flax] shall have the right to acquire, for $.01 (one cent) per share, Company stock in an amount ... equal to fifteen percent (15%) ... of the Company's authorized and issued stock ....

in stock was standard in the industry; and (2) Flax and Paley Rothman had sabotaged the Laidlaw financing after learning that Howard Reissner was the true finder by virtue of his letter and promotional package of March 6, 1996. Flax counterclaimed, charging that Fischer himself had scuttled the financing and thus breached his finder's fee agreement with Flax, and alternatively sought damages on a *quantum meruit* theory. Both Flax and Paley Rothman further alleged that Fischer had brought the suit in bad faith, chiefly because he knew that the documents supporting his assertion that Reissner was the finder in the Laidlaw transaction were fabricated.

## II. Summary Judgment

Fischer contends first that Judge Graae erred in granting summary judgment to attorney Mark and Paley Rothman, who had represented Flax in the ongoing negotiations about Flax's compensation if he secured financing. Fischer originally sued Paley Rothman for extortion, tortious interference, aiding and abetting tortious conduct, and conspiring with Flax to commit such conduct. After the judge dismissed these claims "without prejudice" (concluding that Paley Rothman, through Mark, had done nothing more than represent Flax in his colorable claim to a fee from Fischer), Fischer re-pleaded the tortious interference count, styling it "tortious interference with prospective economic advantage" and claiming that Paley Rothman had unlawfully committed a number of acts intending to injure Fischer in his business relationship with Laidlaw. Fischer now argues that in granting summary judg-

ment to Mark and Paley Rothman, Judge Graae erroneously deemed Fischer to have abandoned all his claims except the newly-pleaded tortious interference.

■ We have no need to join the parties' debate over whether Fischer renewed the other claims originally pleaded, because they are legally insufficient in any case. First, Fischer has cited no law—and we have found none—recognizing a civil cause of action for extortion in this jurisdiction, and it has been rejected elsewhere.[3] Second, Fischer's claims of conspiracy and aiding and abetting are entirely derivative of his claim of tortious interference by Flax. That is because there can be no "conspiracy" with a client if an attorney merely acts within the scope of his employment as an advisor to, or an advocate on behalf of, the client. *See Fraidin v. Weitzman,* 93 Md.App. 168, 611 A.2d 1046, 1079 (1992).[4] Similarly, absent evidence that the attorney knew of wrongful conduct by the client and rendered substantial assistance in committing it, he cannot be held to be agent—an aider and abettor—of that conduct. *See* RONALD E. MALLEN & JEFFREY M. SMITH, LEGAL MALPRACTICE § 6.5, at 560 (5th ed.2000); *Schatz v. Rosenberg,* 943 F.2d 485, 495 (4th Cir.1991).

■ This leaves us with Fischer's claims—under the heading of tortious interference—that Alan Mark, while acting as Flax's counsel, wrongly advanced a "false claim" for compensation on Flax's behalf and, further, advanced that claim *not* as Flax's attorney but for his own benefit as a close friend of Flax. On the

---

**3.** *See, e.g., Bass v. Morgan, Lewis & Bockius,* 516 So.2d 1011 (Fla.Ct.App.1987); *Myers v. Cohen,* 5 Haw.App. 232, 687 P.2d 6, *rev'd on other grounds,* 67 Haw. 389, 688 P.2d 1145 (1984); *Leventhal v. Dockser,* 361 Mass. 894, 282 N.E.2d 680 (1972).

**4.** To hold otherwise would be akin to saying that "a defendant could conspire with his right arm, which held, aimed, and fired the fatal weapon." *United States v. Computer Sciences Corp.,* 689 F.2d 1181, 1190 (4th Cir. 1982).

basis of the full discovery conducted, Judge Graae correctly found no evidence creating a triable issue on either allegation. An attorney "who pursues in good faith his or her client's interests on a matter fairly debatable in the law" cannot be held liable to an opposing party. *Strid v. Converse*, 111 Wis.2d 418, 331 N.W.2d 350, 356 (1983); *see* MALLEN & SMITH § 6.26, at 653–56. Attorney Mark, as Judge Graae concluded,

> was representing Flax on a colorable claim for compensation. Given undisputed facts that Flax had a compensation agreement and performed services for Fischer pursuant to that agreement, that Fischer subsequently executed an agreement with Laidlaw knowing this would breach its agreement with Flax, and [that] Fischer and Flax entered into negotiations to come up with another compensation formula, there is no doubt Mr. Mark had a lawyer's obligation to represent his client Flax on its compensation claim. Even though Flax was holding out for a larger fee than Fischer was prepared to pay, there is not a shred of evidence to support Fischer's claim that Paley Rothman was proceeding in bad faith.[5]

Judge Graae likewise found no record support for Fischer's "strange and counterintuitive" theory that Mark had acted in his own personal interest and outside the scope of his employment by Flax:

> Apparently, this claim rests upon Fischer's assertion that Mr. Mark committed malpractice when he advised Mr. Flax to ask for 15% in his letter agreement and was "protecting his own interests" by urging Flax to hold out for that amount

despite its unenforceability. [To the contrary, t]he only evidence of record on this point is Mr. Flax's testimony that Mr. Mark gave him no advice about the rate of compensation since that had already been the subject of an earlier oral agreement between Mr. Fischer and Mr. Flax.

Further, even assuming evidence of self-interest and thus "malpractice" by Mark in relation to Flax (and, as the trial judge recognized, there was none), Fischer is not in a position to assert it. *See Morowitz v. Marvel*, 423 A.2d 196, 199–200 (D.C.1980) (rejecting "the notion of a negligence action by third parties against adverse counsel").

Fischer's remaining argument against summary judgment is that the trial judge erroneously measured his tortious interference claim against a "clear and convincing evidence" standard. The judge did so, however, only to the extent Fischer accused Mark of having fraudulently advanced the claim to compensation by Flax, *see, e.g., Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 923 (D.C.1992) (fraud must be proved by clear and convincing evidence), correctly determining that no evidence supported that allegation. Whether Fischer charged Paley Rothman with advocating a fraudulent claim or a "false" or bad-faith claim to compensation is a distinction of words only, since the judge rightly found no triable issue of fact on either supported by the evidence.

### III. Continuance

As pointed out, the judge dismissed Fischer's claims against Flax when Fischer, after his renewed request for a continu-

---

5. It also was beyond dispute that Flax had— and Mark and Paley Rothman were advancing—a colorable position that Flax could be compensated as a finder even though he was not a registered broker-dealer. The parties had proffered conflicting expert opinions on whether Flax would have been required to register as a broker-dealer under the securities laws.

ance was denied, declared through counsel that he would not proceed with trial either personally or through his attorney. The case was then tried to a jury on one of Flax's counterclaims. Fischer argues that the judge abused his discretion in refusing to continue the trial date because of what Fischer's physicians had termed his "significant medical problems." We find no such abuse.

## A. The Facts

Trial was originally scheduled for September 16, 1998, but was continued because Fischer needed to hire new counsel. A second trial date of January 4, 1999, was postponed by agreement of all parties until October 4, 1999. On that morning Fischer's counsel, Stanley H. Goldschmidt, told the trial judge that Fischer had collapsed earlier that day and been taken to the hospital by ambulance. The judge agreed that a continuance was necessary to learn more about Fischer's condition, requesting that counsel provide him with "some kind of physician's report as to what is going on." That afternoon, when attorney Goldschmidt still had no information, the judge postponed the trial for two days. The next day, October 5, Goldschmidt transmitted a physician's "report" to the court and parties consisting of two handwritten sentences on a prescription pad which stated that Fischer was having "significant medical problems" and asked that further proceedings be deferred until his condition improved. By return fax, the trial judge replied that the report was insufficient because it failed to provide a diagnosis, condition, or prognosis for Fischer. On October 6, the rescheduled trial date, Goldschmidt still had no additional information for the court.

The judge nevertheless postponed the trial for seven weeks until November 29, 1999. In doing so he restated his need for additional information about Fischer's condition: "perhaps some useful information would be a discharge report from the hospital describing what brought him in there and when they are releasing him, on what conditions they are releasing him and perhaps a description of his symptomatology." On October 19, through a letter to the judge by attorney Goldschmidt, Fischer declared that he would not reveal any information about his medical condition, invoking the physician-patient privilege. On November 3, the judge issued an order finding that Fischer had waived the privilege and directing him to provide detailed medical information justifying a continuance beyond November 29. On November 15, in a second letter to the court, Fischer restated his refusal to provide the information,[6] and on November 24, one business day before trial, he submitted to the court notes from three physicians. The first stated, as before, that Fischer was suffering from "significant medical problems" that would be aggravated by any stress over the next several months. The second explained that Fischer had "a serious medical problem" for which he was being medicated, and "strongly suggest[ed]" that he not take part in any stressful activity that could worsen it "over the next few months." The third likewise stated that Fischer was being treated "for significant medical problems" that counseled against his participating in litigation at this time; "[h]e will require at least 4 months or more to recuperate sufficiently." No additional information was provided.

On the morning of trial, November 29, Judge Graae denied a further continuance stating his reasons on the record. He

---

6. Meanwhile, he had unsuccessfully sought a stay from this court of Judge Graae's order directing him to provide the medical information.

reviewed the prior history of continuances and of Fischer's refusal to comply with the court requests for additional medical information. The judge also did not "think there's any question ... but that the defense is significantly prejudiced by this position having read[ied] themselves twice now for trial." And since he had been denied the "information [required] as a basis for making decisions about whether in this instance a continuance should be granted," the judge concluded that Fischer had left him no choice but to deny the renewed motion.

## B. Discussion

■ " '[T]he grant or denial of a continuance rests within the sound discretion of a trial judge, to whom we accord a wide latitude.' " *Dobbs v. Providence Hosp.*, 736 A.2d 216, 221 n. 8 (D.C.1999) (quoting *Moctar v. United States*, 718 A.2d 1063, 1065 (D.C.1998)). Rule 40–I(d) of the Superior Court Rules of Civil Procedure requires a movant to show "specific and sufficient reasons why [he or she] cannot attend the trial as scheduled or cannot try the case on the date scheduled." Although "in some instances refusal to grant a continuance is reversible error," *Feaster v. Feaster*, 359 A.2d 272, 273 (D.C.1976), this, we conclude, is not one of them.

■ Importantly, the judge did grant Fischer a lengthy continuance from October 6 to November 29 in order to assess whether Fischer's medical condition required still another postponement. Fischer then failed to provide the "specific and sufficient" information the judge requested about his condition, and even declared that he would not provide it beyond the gener-

alized assertions he then offered from his doctors that he had "a serious medical problem" and needed an indefinite, stress-free period ("at least 4 months or more") in which to recuperate. His assertions on appeal that any more concrete description of his condition could not properly be demanded because (a) he "never put the *nature* of his illness at issue" (as though the gravity of the illness could be assessed without knowing its nature) and (b) the judge, "who is not a medical doctor," was unqualified to second-guess his physicians (Br. for App. at 4–5 (emphasis in original)) refute themselves; the latter would strip the judge entirely of the discretion invested in him to grant or deny a continuance for medical reasons.

In *Rymer v. Pool*, 799 A.2d 371 (D.C. 1992), this court upheld the denial of an eve-of-trial continuance request supported by an x-ray report fourteen months old stating that the plaintiff suffered from "chronic duodenal ulcer disease with a residue of inflammatory process in the atrium," and by her more recent letter to her attorney stating that she was " 'still sick.' " *Id.* at 372–73. Although the notes from Fischer's doctors were current, they did not describe the nature of his illness at all despite the judge's rightful demand for a diagnostic explanation warranting another eleventh-hour postponement for several months.[7] The result in this case follows *a fortiori* from *Rymer*.

■ Once Judge Graae properly denied the renewed motion for continuance, Fischer's counsel declared both that Fischer would not appear for trial and that counsel was unable to proceed without his presence. In these circumstances, involv-

---

7. Indeed, the trial judge noted that at least one of the three physicians' reports submitted on the eve of trial had been prepared much earlier, indicating that Fischer's counsel "knew two weeks ago that you were going to be asking for a continuance today [the day of trial]"—in turn calling into question "the good faith of this position that your client has taken."

ing a last-minute request for (another) continuance followed by a refusal to go forward, this court's reasoning in *Taylor v. Washington Hosp. Ctr.*, 407 A.2d 585 (D.C. 1979), controls:

> [W]here the case progresses to the day of trial and the plaintiff, disappointed by rulings of the court which are adverse to her case, then refuses to go forward, a Rule 41(b) dismissal may be appropriate.
>
> In such a situation the aggrieved plaintiff is free to—and should—proceed to trial as limited by the court's procedural rulings, and if not successful at trial challenge those rulings on appeal. A trial judge understandably need not look kindly upon last-minute maneuvers which would wreak havoc on the court's trial calendar, and in the face of a refusal to go forward may in his discretion reject plaintiff's suggestion of dismissing without prejudice or resorting to some other milder sanction. We are loath to disturb a dismissal with prejudice under the circumstances presented here.

*Id.* at 590–91 (citations omitted); *see also Wolfe v. Fine*, 618 A.2d 169, 175–76 (D.C. 1992) ("A key to this court's affirmance of the dismissal order and the related denial of the continuance [in *Taylor*] was the plaintiff's failure to move for a continuance until the day of trial and her refusal to proceed to trial when she could have done so ... and then challenged the adverse rulings on appeal if necessary.").

## IV. Quantum Meruit

Of Flax's counterclaims, the trial judge permitted only the claim of *quantum meruit* for Flax's services in pursuing the financing to go to the jury, which awarded Flax $300,000. Although Fischer took no part in the trial, he argues that the trial judge erroneously denied his motion for summary judgment on the *quantum meruit* claim for several reasons. Flax replies initially, however, that under an impressive line of authority in the federal courts Fischer cannot appeal from the denial of summary judgment once the case proceeded to trial, where Fischer (because he did not participate) made no challenge to the jury's verdict and thus waived any errors related to it.[8] Flax states that the issue "appears to be one of first impression for this Court" (Br. for Flax at 22), but actually it is not, and this court's decisions— unlike the near-unanimous rule in the federal courts—leave substantial doubt whether we can avoid the merits of Fischer's claims.

In *Wagner v. Georgetown Univ. Med. Ctr.*, 768 A.2d 546 (D.C.2001), we acknowledged the principle that "on appeal from a final judgment after trial, the correctness of a pretrial denial of summary judgment is ordinarily not subject to review, because that denial is superseded by the trial of the case on the merits." *Id.* at 559 (citing *Morgan v. American Univ.*, 534 A.2d 323, 326–29 (D.C.1987)). In *Morgan*, however, the court had left open (saying "[w]e need take no position on") the issue of whether purely "legal" rulings made in denying summary judgment can be challenged later although not preserved by a motion for a directed verdict or JNOV at trial. *Id.* at 327 & n. 8. In *District of Columbia v. Tinker*, 691 A.2d 57 (D.C.1997), we relied on *Morgan* in holding that a denial of summary judgment based on a "legal" determination that the statute of limitations had not run—an issue we said was "in no sense

---

8. A list of the federal court of appeals' decisions—representing eleven Circuit Courts— holding that the denial of summary judgment is not reviewable on appeal after a full trial and final judgment on the merits is contained in *Lind v. United Parcel Serv.*, 254 F.3d 1281, 1284–85 (11th Cir.2001).

subsumed within the factual issues [later] presented to the jury"—was not superseded by the trial and was reviewable. *Id.* at 62.[9] But we went on "addition[ally]" in *Tinker* to hold that the defendant's "renewal of the [summary judgment] motion by way of a motion for directed verdict [at trial] was sufficient to preserve the issue for appellate review, as *Morgan* itself teaches." *Id.*

As will become apparent, Fischer's attacks on the *quantum meruit* claim are at most a mixed blend of "legal" and "factual," and so it is not clear that he even fits within the exception recognized in *Tinker*. Moreover, the dual holding of *Tinker*—and the ambiguity of *Morgan* on the point, *see* note 9, *supra*—leave unclear whether this court has adopted the exception, which has been criticized by courts elsewhere.[10] These matters do not have to detain us further, however, because, as we now show, Fischer's argument that he was wrongly denied summary judgment is mistaken in any event.

 Flax counterclaimed against Fischer on the "implied-in-fact" theory of *quantum meruit* recovery.[11] As the jury

9. The *Tinker* court evidently viewed *Morgan* as having adopted a legal/factual distinction because of the following sentence in *Morgan* (quoted in *Tinker*, 691 A.2d at 62): " '[A]ny legal rulings made by the trial court [at summary judgment] affecting that final judgment can be reviewed ....' " *Morgan*, 534 A.2d at 327 (quoting with approval *Evans v. Jensen*, 103 Idaho 937, 655 P.2d 454, 459 (1982)). Whether purposely or not, however, the *Morgan* court had deleted the final part of this sentence from *Evans*, which stated: " ... can be reviewed at that time [*i.e.*, after trial] *in light of the full record* "—indicating that *Evans* rejected any exception from the rule of nonappealability for "legal" determinations. *See also id.*, at 459 ("We are persuaded that we should now adopt the general rule."). The safest thing to say, perhaps, is that *Morgan* was ambiguous on whether the general rule admits of an exception for "legal" rulings.

10. For example, in *Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp.*, 51 F.3d 1229 (4th Cir.1995), the court rejected the law/fact distinction reasoning as follows:

[Stone & Webster's] argument advocates a dual approach in which this Court would review denials of summary judgment after a full trial when the party seeking review alleges that the district court made an erroneous legal conclusion, such as applying an incorrect legal standard, but not when the party seeking review alleges that the court made an erroneous factual determination. We reject the contention that our review should depend on whether the party claims an error of law or an error of fact. Such a

dichotomy is problematic because all summary judgment decisions are legal decisions in that they do not rest on disputed facts. The legal nature of summary judgment decisions is evident from our traditional de novo standard for reviewing such decisions. Furthermore, such a dichotomy would require this Court to engage in the dubious undertaking of determining the bases on which summary judgment is denied and whether those bases are "legal" or "factual." *See Wells v. Hico Indep. Sch. Dist.*, 736 F.2d 243, 251 n. 9 (5th Cir.1984) (declining to review denial of summary judgment after full trial on the arguably "legal" issue of whether claimants had property interest in their teaching positions), *cert. dismissed*, 473 U.S. 901, 106 S.Ct. 11, 87 L.Ed.2d 672 (1985). The Federal Rules of Civil Procedure do not require such a dichotomy in summary judgment denials, see Fed. R.Civ.P. 56(c), and we decline to create a new jurisprudence in which district courts would be obliged to anticipate parties' arguments on appeal by bifurcating the legal standards and factual conclusions supporting their decisions denying summary judgment.

*Id.* at 1235 (citations omitted).

11. "An implied-in-fact contract is a true contract, containing all necessary elements of a binding agreement; it differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt." *Bloomgarden v. Coyer*, 156 U.S.App. D.C. 109, 116, 479 F.2d 201, 208 (1973), *quoted in*

was instructed, this required Flax to prove (1) that he performed valuable services for Fischer, (2) that Fischer accepted, used, and enjoyed Flax's services, and (3) that the circumstances reasonably put Fischer on notice that Flax expected to be paid by him. *Vereen, supra* note 11, 623 A.2d at 1193; *In re Rich*, 337 A.2d 764, 766 (D.C. 1975). Fischer's first argument is not that Flax failed to prove any of these elements, but that because he and Flax had a written contract (the Letter Agreement) in effect at the time Flax performed, Flax cannot sue on a *quantum meruit* theory. *See, e.g., Bingham v. Goldberg Marchesano Kohlman, Inc.*, 637 A.2d 81, 94 n. 30 (D.C. 1994); *Standley v. Egbert*, 267 A.2d 365, 368 (D.C.1970) ("*[Q]uantum meruit* is not applicable when compensation of the parties is covered by an express written contract."). However, "[w]hen performance of a contract is deemed impossible[,] it is a nullity," and in such circumstances *quantum meruit* recovery may lie. *See Transatlantic Fin. Corp. v. United States*, 124 U.S.App. D.C. 183, 191, 363 F.2d 312, 320 (1966); *see also id.* ("when impracticability without fault occurs, the law seeks an equitable solution, and *quantum meruit* is one of its ... devices" (citation omitted)). *And see Jonathan Woodner Co. v. Laufer*, 531 A.2d 280, 285 (D.C.1987) (by implication). Here the trial judge found the Letter Agreement to be unenforceable as a matter of law because the parties both erroneously believed a finder's fee of 15% to Flax, together with Laidlaw's commission, would be compatible with the NASD regulations. Fischer did not argue below—and

does not argue now—that whether the Letter Agreement could be performed was an issue of fact for the jury. We find no error in the judge's conclusion that it could not, and accordingly in his decision to submit Flax's entitlement to compensation to the jury on *quantum meruit*.

▮▮▮ Fischer next argues that because the Laidlaw financing did not materialize, he gained nothing from Flax's services, and so allowing Flax to recover for them would be inequitable. But beyond the fact that this blurs the distinction between a contract implied-in-fact (at issue here) and the quasi-contract theory of unjust enrichment, *see Vereen*, 623 A.2d at 1193–94,[12] Fischer ignores the evidence Flax presented demonstrating that Fischer was responsible for the delay and disagreements that ultimately doomed the transaction. Although Flax could not reasonably expect to be compensated if he himself substantially caused the failure, the issue of who bore responsibility was clearly disputed at the time of summary judgment, and Fischer cannot complain of the jury's resolution of the issue against him.[13]

Finally, based upon his contention that Flax had not registered as a broker-dealer as he was obliged to do, Fischer argues that the Letter Agreement was void as against public policy, *see Kirschner v. Klavik*, 186 A.2d 227, 229 (D.C.1962), and that in such a case "the wrongdoer [, Flax, could not] sue ... for the value of his services or for the value of the benefits conferred upon the other party." *Id.* This

*Vereen v. Clayborne*, 623 A.2d 1190, 1193 (D.C.1993).

12. " 'A quasi-contract ... is not a contract at all, but a duty thrust under certain conditions upon one party to requite another in order to avoid the former's unjust enrichment." ' *Vereen*, 623 A.2d at 1194 (quoting *Bloomgarden*, 156 U.S.App. D.C. at 116, 479 F.2d at 208).

13. Although the trial judge did not instruct the jury to decide who was at fault, Flax's attorney plainly put the issue before the jury. Since Fischer did not object to the instructions—he had boycotted the trial—he cannot protest any defect in the law given to the jury. *See Miller v. Avirom*, 127 U.S.App. D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967).

argument ignores the proffered testimony of Flax's expert, Lipton, that Flax was not required to register in the circumstances of this case, and so had committed no "wrong." Lipton's testimony created an issue of fact that precluded summary judgment.

## V. Bad Faith

We consider lastly Fischer's argument that the trial judge improperly awarded attorney's fees and costs to Flax and Paley Rothman after concluding that Fischer had filed and prosecuted his claims against each of them in bad faith.[14] Once more, Fischer's case is not aided by the fact that he declined to attend—personally or through counsel—the evidentiary hearing the judge conducted on this issue.

The general standards governing an award of attorney's fees for bad faith litigation are well-known and need not be repeated here. *See, e.g., Goffe v. Pickard,* 588 A.2d 265, 271 (D.C.1991); *General Fed'n of Women's Clubs v. Iron Gate,* 537 A.2d 1123, 1127–28 (D.C.1988). The appellees concede that a finding of bad faith must be supported by clear and convincing evidence. *See, e.g., Association of Am. Physicians v. Clinton,* 337 U.S.App. D.C. 394, 399, 187 F.3d 655, 660 (1999).[15] On the other hand, "an appellate court's role in [the] determination [of bad faith] is limited: 'The predicate finding of bad faith *vel non* is a factual one which we review under the clearly erroneous standard,' and the decision to award fees will be reversed only for abuse of discretion." *Goffe,* 588 A.2d at 271 (citations omitted).

The trial judge's finding of bad faith rested predominantly on Fischer's filing and prosecution of his claim that Howard Reissner had been the true finder of the Laidlaw financing and that Flax had chosen to scuttle the transaction after learning that he would not receive the finder's fee. Evidence presented at the hearing convinced the judge that the Reissner claim was "spurious" because the March 6, 1996, letter from Reissner to Laidlaw touting Fischer's proposal had actually been prepared on March 24, 1996, *after* Flax's initial contact with Laidlaw, but backdated to a date before that contact began; and that Fischer knew the truth about the letter before filing suit. Moreover, the judge found, during discovery Fischer had played a "direct role" in "creating" and passing off as authentic three additional letters from Reissner purporting to establish his priority as finder,[16]

---

14. This ruling is one—but only one—of many Fischer asserts as evidence of bias by Judge Graae that should have caused him to recuse himself on Fischer's repeated motions under Super. Ct. Civ. R. 63–I. Judge Graae issued a lengthy written order explaining his decision not to recuse himself. Under the governing standards, *see, e.g., Liteky v. United States,* 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994); *Dupont Circle Citizens Ass'n v. District of Columbia,* 766 A.2d 59, 65 (D.C.2001), that decision is unassailable, as (1) the great bulk of Judge Graae's conduct on which Fischer relies consisted of rulings in the case for which sound reasons were given or were ready at hand, and (2) occasional remarks by the judge evincing displeasure with Fischer or his attorney do not come close to demonstrat-

ing partiality in the forbidden sense. *See Liteky,* 510 U.S. at 551–52, 114 S.Ct. 1147.

15. That accords with the principle that the award of fees as a deterrent to bad faith litigation, as an exception to the American Rule, operates only "in extraordinary cases." *Launay v. Launay,* 497 A.2d 443, 450 (D.C. 1985).

16. Reissner originally testified at deposition that the letters had been located in his company files, but later asserted through counsel that he had caused them to be "recreated from his recollection." Still later he denied having been involved in the "re-creation," and other testimony revealed that in fact it was Fischer who had instructed a secretary to

while at the same time he left uncorrected Reissner's deposition testimony about the letters which Fischer "knew to be untrue." In short, throughout the litigation Fischer had "orchestrated a continuing cover-up of his involvement in" the preparation of letters "fraudulent[ly] document[ing]" Reissner's entitlement to the finder's fee.

 These findings by Judge Graae, tantamount to a determination that Fischer had "perpetrated a fraud upon the court," *Synanon Found., Inc. v. Bernstein,* 517 A.2d 28, 37 (D.C.1986), are not clearly erroneous. *Goffe, supra.* By themselves they lend strong support to the judge's conclusion that Fischer's entire suit was filed and maintained in bad faith. But as the fee award rested partly on the finding that the other two factual allegations underlying the suit were not colorable either,[17] we briefly examine that basis as well.

Besides the claim that Flax and his attorneys had thwarted the financing because they knew Reissner was the true finder, Fischer alleged that in pursuing the deal with Laidlaw he had relied to his detriment on two misrepresentations by Flax: that he was a licensed broker-dealer of securities versed in raising capital through public stock offerings, and that a 15% finder's fee in the form of company stock would pose no bar to the financing. Judge Graae found by clear and convincing evidence that any representation Flax had made to Fischer about being registered played no part in Fischer's decision to use his services. As longtime friends, the two had pursued a previous business venture together in which Flax proved his ability

to find potential sources of capital for Fischer. Consequently, the judge found, Fischer sought out Flax's help in the present matter not "as a broker-dealer in securities" but simply as one "who would be looking for an underwriter who could issue stock and find investors." Indeed, at his deposition Fischer agreed that at the time of the Letter Agreement he did not know what a broker-dealer and a broker-dealer license were. The judge likewise found no evidence that Flax had misled Fischer to believe the 15% fee to him was compatible with NASD regulations despite the commission Laidlaw would also require. The judge quoted Fischer's own letter to Flax in May 1996 while they were negotiating their fee dispute and before Fischer filed suit:

> Clearly, when we agreed to certain terms and conditions, neither one of us had any understanding of the securities regulations, maximized compensation, and/or full understanding of what we were up against. This is a mistake we both made due to our lack of experience in this field. I am truly sorry that this situation has escalated to where it is today. If I could change the past, I would and I am sure you would too.

This statement, the judge found, was in keeping with Flax's deposition testimony and the history of dealings between the two men regarding the Fischer Brewing business; together they proved that Fischer's claim that Flax had misrepresented his knowledge of industry practices "not only [is] false but ... [that] Fischer always knew it to be false." Again these findings are not clearly erroneous, and we will not disturb them.

---

"retype" the letters using as a model the putative March 6, 1996, letter from Reissner to Laidlaw.

**17.** " 'A claim is colorable, for the purpose of the bad faith exception, when it has some

legal and factual support, considered in light of the reasonable beliefs of the individual making the claim.' " *Synanon,* 517 A.2d at 40 (quoting *Nemeroff v. Abelson,* 620 F.2d 339, 348 (2d Cir.1980)).

All told, the trial judge concluded that Fischer's conduct in pursuing claims of wrongdoing by Flax and Paley Rothman—especially those founded on the Reissner letter—that he knew were unsupportable was "so egregious that . . . fee shifting is warranted as a matter of equity." *General Fed'n of Women's Clubs,* 537 A.2d at 1128. We find no abuse of discretion in that decision.[18]

*Affirmed.*

---

**18.** Fischer does not challenge the quantum of fees the judge awarded to either appellee, nor does he independently question the punitive damages the judge superimposed upon that award. We explained in *Synanon,* 517 A.2d at 39, that although a trial judge may not use attorney's fees under the bad-faith exception as a means to award "punitive damages under another name," punitive damages may be "[ ]appropriate" in addition to such fees where the requisite findings have been made after a trial, as here. We have no reason to examine *sua sponte* the punitive damages award in this case.