STATE OF MAINE
CUMBERLAND, ss

BUSINESS AND CONSUMER COURT
Location: Portland
Docket No.: BCD-CV-13-38
AMH·CUM - 3/11/2014  ✓

TOWN OF EDGECOMB,          )
                          )
         Plaintiff,        )
                          )
    v.                     )
                          )
EDGECOMB DEVELOPMENT, LLC, )
ROGER BINTLIFF, THE BANK OF )
MAINE, and SBM PROPERTY A, INC., )
                          )
         Defendants        )
                          )

**ORDER AND JUDGMENT**

The core issue in this case is, which party is entitled to receive payments pursuant to a Credit Enhancement Agreement (CEA) that Plaintiff Town of Edgecomb entered into with Defendant Edgecomb Development, LLC. The issue is presented by virtue of the Motion for Summary Judgment filed by Defendant The Bank of Maine. Defendant SBM Property A, Inc. has adopted the Bank's motion and also seeks judgment in its favor. Edgecomb Development opposes the motion.

The Bank asserts that Edgecomb Development's rights under the CEA were sold at a public sale after Edgecomb Development defaulted on its obligations to the Bank, and were thereafter transferred by the Bank to SBM Property A, Inc. The Bank also asserts that Edgecomb Development's arguments are barred by the doctrines of release and res judicata. In support of its claim that it remains entitled to receive payments due under the CEA, Edgecomb Development asserts that the CEA was never transferred to any other party, and that the doctrines of release and res judicata in fact run against the Bank's claim.

1

Although the Bank and Edgecomb Development disagree on which of them should prevail on the Bank's motion, they do agree that summary judgment for one or the other is appropriate. *See* M.R. Civ. P. 56.

## FACTUAL BACKGROUND

The facts in this case are largely undisputed.

*The relevant agreements.* In November of 2004, the Town established a tax increment financing (TIF) district applicable to the Sheepscot River Inn properties located on Davis Island.[1] (S.S.M.F. ¶ 1; O.S.M.F. ¶ 1.) In accord with the TIF district, Town and Edgecomb Development entered into the CEA on July 18, 2005. (S.S.M.F. ¶ 2; O.S.M.F. ¶ 2.) Edgecomb Development was designated the "Developer" in the CEA. (S.S.M.F. ¶ 3; O.S.M.F. ¶ 3.) The purpose of the CEA was to facilitate the construction of certain infrastructure improvements by Edgecomb Development at the Davis Island Project, primarily the construction of sewer and water mains and related improvements. (S.S.M.F. ¶ 4; O.S.M.F. ¶ 4.) In exchange for Edgecomb Development completing those improvements, the CEA provided that the Town would pay Edgecomb Development a percentage of tax receipts by the Town on the increased assessed value of the Davis Island project above the assessed value of the property at the outset of the agreement, prior to any infrastructure improvements. (S.S.M.F. ¶ 5; O.S.M.F. ¶ 5.) The payments were intended to help defray project development costs and payments that would be owed by Edgecomb Development on project financing. (S.S.M.F. ¶ 5; O.S.M.F. ¶ 5.)

Between August 2005 and September 2008, Edgecomb Development and the Bank entered into a series of loans, collectively totaling $14,649,785 in original principal amounts,

---

[1] A TIF district is a type of development district, which is an area within a municipality designated for development or rehabilitation. *See* 30-A M.R.S. § 5223 (2013) (outlining the requirements for development districts). A municipality establishing a development district must simultaneously adopt a development program. *See* 30-A M.R.S. § 5224(1) (2013). A TIF district utilizes tax increment financing, wherein increased tax revenues from any increase in the assessed values of property in the development district are captured and can be paid to the municipality, the developer, or split between the two. *See* 30-A M.R.S. §§ 5222, 5227 (2013).

2

the proceeds of which were applied by Edgecomb Development toward the development of the Davis Island Project (the "Loans"). (S.S.M.F. ¶ 7; O.S.M.F. ¶ 7.) In connection with each of the Loans, Edgecomb Development executed a Security Agreement and Chattel Mortgage. (S.S.M.F. ¶ 8; O.S.M.F. ¶ 8.) The Security Agreements provided in part that Edgecomb Development granted the Bank a security interest in

> any and all accounts and accounts receivable and general intangibles of Edgecomb Development, LLC, including but not limited to trade names, trade marks, service marks, patents, copyrights, now owned or hereafter acquired and wherever located. Also a security interest in any and all tangible property and intangible property of Edgecomb Development, LLC, including but not limited to consumer goods, inventory, machinery and equipment, instruments, documents, chattel paper, and general intangible now owned or hereafter acquired and wherever located and the proceeds thereof and fixtures and accession thereto; whether any of the foregoing is owned now or acquired later; all accession, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and accounts proceeds).

(S.S.M.F. ¶ 9; O.S.M.F. ¶ 9.) The Security Agreements further state that the Bank was given a security interest in

> all monies due or to become due to the Debtor under all contracts for the sale, lease or rental of goods and/or the performance of services in connection with the operation of the Edgecomb Development, LLC (whether or not yet earned by performance on the part of the Debtor), now in existence or hereafter arising, including, without limitation, the right to receive the Proceeds of such purchase orders and contracts and all collateral security and guarantees of any kind given by any Person with respect to any of the foregoing;

> [and]

> All contracts, instruments, undertakings, documents or other agreements in or under which the Debtor may now or hereafter have any right, title or interest in connection with the Premises and operation by the Debtor of the Edgecomb Development, LLC.

(S.S.M.F. ¶ 10; O.S.M.F. ¶ 10.)

On April 20, 2009, Edgecomb Development and the Bank executed a Collateral Assignment of the CEA, in which assignment Edgecomb Development "assigns, transfers and

3

sets over to the [Bank] all of the right, title and interest of [Edgecomb Development] in to and under" the CEA. (S.S.M.F. ¶¶ 11-12; O.S.M.F. ¶¶ 11-12; A.S.M.F. ¶ 1; R.S.M.F. ¶ 1.) Under the terms of the collateral assignment, Edgecomb Development could collect payments pursuant to the CEA from the Town when due as long as there was no default of any of the Loans. (S.S.M.F. ¶ 13; O.S.M.F. ¶ 13.) Upon default by Edgecomb Development of any of the Loans, the Bank could then without notice or demand collect and receive the payments from the Town under the CEA. (S.S.M.F. ¶ 13; O.S.M.F. ¶ 13; A.S.M.F. ¶ 2; R.S.M.F. ¶ 2.) The Town consented to the collateral assignment. (S.S.M.F. ¶ 14; O.S.M.F. ¶ 14.) On May 1, 2009, the Bank issued a notice of default under the Loans to Edgecomb Development. (S.S.M.F. ¶ 15; O.S.M.F. ¶ 15; A.S.M.F. ¶ 3; R.S.M.F. ¶ 3.)

*The public auctions.* On December 11, 2009, the Bank published notice in the Kennebec Journal of its intent to sell the personal property and the real property of Edgecomb Development as an entirety. (A.S.M.F. ¶¶ 5-6; R.S.M.F. ¶¶ 5-6.) On December 28, 2009, the Bank held a public sale of all personal property of Edgecomb Development pursuant to the UCC, and a public sale of the real property of Edgecomb Development pursuant to the power of sale foreclosure statutes. (S.S.M.F. ¶ 17; O.S.M.F. ¶ 17.) The Bank was the highest bidder at the December auction in the amount of $7,500,000. (S.S.M.F. ¶ 18; O.S.M.F. ¶ 18; A.S.M.F. ¶ 9; R.S.M.F. ¶ 9.) The parties dispute the import and consequences of the December auction, but do not dispute the fact of the notice, sale, and highest bid.

Because the affidavit and notice of sale from the December 2009 auction were not recorded in the registry of deeds within the time period specified by 14 M.R.S. § 6203-B (2013), the Bank noticed and conducted a second auction of the real estate in January 2010. (A.S.M.F. ¶¶ 7-8; R.S.M.F. ¶¶ 7-8.) The Bank again had the highest bid of $7,500,000 at the second auction for the real estate. (A.S.M.F. ¶ 10; R.S.M.F. ¶ 10.) Again, although the parties dispute

4

the import and consequence of the January auction, the parties do not dispute the fact of the notice, sale, and highest bid. The parties also agree that no interest in the CEA was sold at the January auction. (A.S.M.F. ¶ 12; R.S.M.F. ¶ 12.) The Bank assigned its interest in the personal property of Edgecomb Development and the CEA to SBM Property A, Inc. (SBM) on December 29, 2009. (M. Intervene Exhs. A, B.)

*The prior litigation.* On October 28, 2009, the Bank filed a lawsuit (the "Prior Litigation") against Edgecomb Development, Roger Bintliff, and Bintliff's Restaurant Corp. (collectively, the "Edgecomb Defendants"), seeking to recover amounts owed on the Loans. (S.S.M.F. ¶ 16; O.S.M.F. ¶ 16; A.S.M.F. ¶ 4; R.S.M.F. ¶ 4.) The Bank asserted claims for breach of contract against all the Edgecomb Defendants and conversion against Bintliff. The Edgecomb Defendants counterclaimed for breach of oral contract, breach of the duty of good faith and fair dealing, breach of fiduciary duty, negligent misrepresentation, negligence, promissory estoppel, and unjust enrichment. (S.S.M.F. ¶ 21; O.S.M.F. ¶ 21.) Among other allegations, the Edgecomb Defendants alleged that they were misled regarding the assignment of the CEA and sought damages for the full value of the TIF agreement from the Bank. (S.S.M.F. ¶¶ 23-27; O.S.M.F. ¶¶ 23-27.) The case was accepted for transfer to the Business and Consumer Docket on September 30, 2010. *See* Order, *Sav. Bank of Me. v. Edgecomb Dev., LLC*, BCD-CV-10-48 (Me. Bus. & Consumer Ct. Sept. 30, 2010).

In the course of litigation, Priority Management Group, LLC was appointed receiver for the Davis Island Project. (S.S.M.F. ¶ 19; O.S.M.F. ¶ 19.) The Town issued several TIF payments pursuant to the CEA to the Bank, through Priority Management Group, LLC between April 2010 and April 2012. (S.S.M.F. ¶ 19; O.S.M.F. ¶ 19.) The Town has not issued any payment to the Bank since then, although the Town is holding funds payable under the terms of the CEA. (S.S.M.F. ¶ 20; O.S.M.F. ¶ 20; *see also* Compl. ¶¶ 18-21.)

5

The parties ultimately resolved the litigation in October 2011 through a stipulation of dismissal pursuant to M.R. Civ. P. 41(a)(1), in which "all counts of the Complaint and Counterclaim, and all claims, counterclaims and third-party claims which actually were asserted or which could have been asserted, shall be dismissed with prejudice." (S.S.M.F. ¶ 28; O.S.M.F. ¶ 28.) The parties entered into a contemporaneous settlement agreement and release, pursuant to which Edgecomb Development and Bintliff released the Bank

> from and any all claims . . . of whatever kind or character, direct or indirect, whether known, unknown, or capable of being known, from the beginning of time through the date on which the last Party executes this Agreement, arising at law or in equity, by right of action or otherwise, that [Edgecomb Development or Bintliff] have, had, or may have had against the [Bank], including without limitation, express or implied, any and all claims relating to the Loan Documents, the Accounts or any other lender-borrower relationship between the Parties, the Bank's foreclosure of any property owned by Edgecomb [Development], any actions taken by the Bank with respect to any foreclosed property previously owned by Edgecomb [Development], the ownership and other rights of the Bank with respect to any foreclosed property previously owned by Edgecomb [Development] or that were or could have been asserted in the Litigation.

(S.S.M.F. ¶ 29; O.S.M.F. ¶ 29.)

## PROCEDURAL BACKGROUND

The Town filed suit in Lincoln County Superior Court on June 21, 2013, seeking a declaratory judgment as to "which of the named defendants is entitled to receive certain tax reimbursement payments payable by the Town under the [CEA]." (Compl. ¶ 1.) As of April 25, 2013, the Town held $71,907.78 of TIF payments in an account pending a determination of the proper recipient. (Compl. ¶ 21.) The case was approved for transfer to the Business and Consumer Court on August 19, 2013. In its September 6, 2013, case management scheduling order, the Court stayed action on the pending motion for summary judgment filed by the Bank until the parties could confer about the arbitrability of the dispute.

6

On September 26, 2013, Edgecomb Development and Bintliff withdrew their demand for arbitration. On October 11, 2013, the Bank withdrew its motion for summary judgment filed August 12, 2013; the Bank filed the present motion on October 17, 2013. Edgecomb Development and Bintliff filed a M.R. Civ. P. 56(f) motion on October 18, 2013, but later withdrew the motion on November 19, 2013. SBM intervened in this matter by agreement on January 14, 2014, and adopted by reference all of the arguments of the Bank in the pending motion.[2] The Court held oral argument on February 19, 2013.

## STANDARD OF REVIEW

In order for a party to obtain summary judgment, there must be no genuine dispute as to any material fact and the party must show it is entitled to judgment as a matter of law. *See* M.R. Civ. P. 56(c). For purposes of summary judgment, a "material fact is one having the potential to affect the outcome of the suit." *Burdzel v. Sobus*, 2000 ME 84, ¶ 6, 750 A.2d 573. A factual issue is genuine when there is sufficient supporting evidence that would "require a fact-finder to choose between competing versions of the truth at trial." *Inkel v. Livingston*, 2005 ME 42, ¶ 4, 869 A.2d 745 (quotation marks omitted). A party with the burden or proof wishing to avoid summary judgment must present a prima facie case for each claim or affirmative defense asserted. *See Reliance Nat'l Indem. v. Knowles Indus. Servs., Corp.*, 2005 ME 29, ¶ 9, 868 A.2d 220.

At this stage, the facts in the summary judgment record are reviewed "in the light most favorable to the nonmoving party." *Lightfoot v. Sch. Admin. Dist. No. 35*, 2003 ME 24, ¶ 6, 816 A.2d 63. "If material facts are disputed, the dispute must be resolved through fact-finding." *Curtis v. Porter*, 2001 ME 158, ¶ 7, 784 A.2d 18.

---

[2] For simplicity, the Court only refers to the Bank for the rest of the order, with the understanding that the positions of the Bank and SBM are functionally identical.

## DISCUSSION

The Town requests that the Court declare which of the Defendants is entitled to receive the TIF payments pursuant to the CEA that the Town is holding pending direction from the court and the TIF payments that will accrue hereafter.[3] The Bank asserts that it is entitled to the payments because it purchased all the personalty of Edgecomb Development in December 2009 and any claim Edgecomb Development may have had to challenge the propriety of the sale is barred by res judicata and the release pursuant to the settlement of the Prior Litigation. Edgecomb Development argues that the January 2010 sale of the real estate of Edgecomb Development effectively voided the previous sale in December of 2009. Accordingly, because the personalty of Edgecomb Development was not sold at the January 2010 auction, Edgecomb asserts it is still entitled to the payments. The Town does not assert any claim to the TIF payments, nor does it side with either of the Defendants; the Town seeks only guidance in the form of a declaratory judgment regarding whom it should pay.

Two issues regarding Roger Bintliff and SBM deserve brief mention. The parties agree that Roger Bintliff, individually, is not entitled to the payments, as he was not a party to the CEA in the first instance. Edgecomb Development originally challenged the Bank's standing in light of the Bank's transfer of its rights to SBM, but SBM has intervened in the matter and adopted the motion of the Bank, rendering the standing issue moot. The Court does not address those two issues any further.

I.    The CEA Agreement was included in Edgecomb Development's personalty

The Bank asserts that the CEA was part of Edgecomb Development's personalty, which the Bank purchased at the December 2009 auction. Facially, Edgecomb Development's rights

---

[3] At oral argument, counsel for Edgecomb confirmed that Edgecomb does not seek to recover or challenge any amounts the Town has already disbursed to the Bank or the Bank's designee for TIF payments. Accordingly, the declaratory judgment in this case is limited to the funds the Town is holding for TIF payments that have accrued, as well as to the TIF payments that will accrue hereafter.

8

in the CEA would fall within the security interest granted to the Bank in Edgecomb Development's instruments and documents, (*see* S.S.M.F. ¶¶ 9-10; O.S.M.F. ¶¶ 9-10), and Edgecomb Development does not assert otherwise. Instead, Edgecomb Development, in an argument first raised at the hearing on this motion, asserts that the CEA itself precludes any assignment or pledge of the rights within it to any other party absent consent of the Town. Because the Town did not consent to the pledge, the argument continues, the CEA could not have been part of the personalty sold to the Bank.

Edgecomb Development's argument, in addition to not being raised in a timely fashion, is also contrary to the plain language of the CEA. Section 7.1 of the CEA provides:

### Section 7.1. Consent to Pledge and/or Assignment.

The Town hereby acknowledges that the Developer may pledge or assign its right, title and interest in, to and under this Agreement as collateral for financing for a Future Project, although no obligation is hereby imposed on the Developer to may such assignment or pledge. Recognizing this possibility, the Town hereby consents and agrees to the pledge and assignment of all the Developer's right, title and interest in, to and under this Agreement and in, and to the payments to be made to Developer hereunder, to third parties as collateral or security for financing a Future Project under the Development Program, on one or more occasions during the term hereof.

No pledge or assignment of this Agreement shall be effective as against the *Town* until a written notice thereof has been delivered to and received by the Town, from the Developer, in the manner specified elsewhere in this Agreement. . . .

. . . .

### Section 7.3. Assignment.

Except as provided in sections 7.1 and 7.2 above, and section 8.1 below, no assignment of any interest in this Agreement by the Developer to a third party shall be valid as against the Town without the prior express written consent of a majority of the Town's Board of Selectmen then in office, which consent shall not be unreasonably withheld or delayed. . . .

(Butler Aff. Exh. 1 §§ 7.1, 7.3 (emphasis added).) Section 7.1 clearly provides prospective consent for Edgecomb Development to pledge its rights in the agreement as collateral for the

9

Loans.[4] Edgecomb Development argues that the consent provisions within section 7.3 of the CEA modify the prospective consent of the Town in section 7.1, but the Court disagrees. Section 7.3 only requires "written consent of a majority of the Town's Board of Selectmen then in office" for an *assignment*, not for a pledge of collateral. (Butler Aff. Exh. 1 § 7.3.) As Edgecomb Development admitted at argument, an assignment is not the same as pledge of collateral. Moreover, section 7.3 excepts from its application section 7.1. (Butler Aff. Exh. 1 § 7.3.) In short, the Court concludes that the Edgecomb Development's personalty pledged to the Bank includes the CEA and Edgecomb Development's rights thereunder.

II.     The December 2009 sale was not invalidated by the recordation issue

Edgecomb Development's next argument is that the December 2009 sale was voided by the subsequent January 2010 sale of the real estate only. At the December 2009 sale, the Bank was the high bidder of both the personalty and real estate. (S.S.M.F. ¶ 18; O.S.M.F. ¶ 18; A.S.M.F. ¶ 9; R.S.M.F. ¶ 9.) The Bank chose to re-notice the sale of the real estate after the notice prescribed by 14 M.R.S. § 6203-B was not recorded within 30 days of the December 2009 sale.[5] (A.S.M.F. ¶¶ 7-8; R.S.M.F. ¶¶ 7-8.) The second notice did not include the personalty. At the January 2010 sale, the Bank was again the highest bidder for the real estate. (A.S.M.F. ¶ 10; R.S.M.F. ¶ 10.)

As noted by the Bank, pursuant to Maine's adoption of the Uniform Commercial Code (UCC), upon default, a secured party may dispose of the collateral as long as it provides sufficient notice to the debtor. *See* 11 M.R.S. §§ 9-1610 to -1612 (2013). The "secured party

---

[4] The record is silent as to whether Edgecomb Development provided the requisite notice to the Town regarding the pledge of the CEA to the Bank, but the notice provision has no effect on the legitimacy of the pledge. The notice provision serves primarily to protect the Town from liability for payments made to the Developer or to the assignee or pledgee. (*See* Butler Aff. Exh. 1 § 7.1.) Moreover, the Town is not making any claim to the TIF payments, and no party has challenged the effectiveness of the assignment based upon the notice provision.

[5] The Bank asserts that the notice was sent for recordation to the Lincoln County Registry of Deeds in a timely fashion, but was not in fact recorded within the 30 day time period. (Reply Memo. 5.)

10

may purchase the collateral." 11 M.R.S. § 9-1610(3). Disposition of property at a UCC sale "[t]ransfers to a transferee for value all of the debtor's rights in the collateral." 11 M.R.S. § 9-1617(1). There is no suggestion that Edgecomb Development did not receive notice of the UCC sale of its personalty or that the Bank did not comply with the statutory notice provisions.

Instead, Edgecomb Development's arguments focus on the failure to record the notice of the real estate. According to Edgecomb Development, the failure to comply with all the notice requirements 14 M.R.S. § 6203-B for the real estate sale not only invalidates the real estate sale, it also invalidates the personalty sale because they were to be sold "in the entirety."

Section 6203-B states that "[t]he person selling shall, within 30 days after the sale, cause a copy of the notice as published and the person's affidavit, fully and particularly stating the person's acts, or the acts of the person's principal or ward, to be recorded in the registry of deeds for the county where the land lies." 14 M.R.S. § 6203-B. The statute does not state the consequence of failing to record the notice and affidavit, but whatever that consequence may be, it does not invalidate the sale. Provided that the mortgagee has provided proper notice of the sale, at the subsequent sale "the premises are considered to have been sold, and the deed thereunder must convey the premises subject to and with the benefit of all" existing encumbrances created prior to the mortgage.[6] 14 M.R.S. § 6203-A(4) (2013).

As far as the Court can tell, the only consequence of failing to record the notice of sale and affidavit in a timely fashion is a potential cloud on the title.[7] A technical defect in recordation does not invalidate the entirety of foreclosure sale pursuant to a power of sale

---

[6] In its opposition to the motion, Edgecomb Development argues that the notice of the sale of the real estate published in the Kennebec Journal did not meet the requirements of 14 M.R.S. § 6203-A(1) (2013) because it is not a "a newspaper of general circulation in" Edgecomb, "the town where the land lies." (Opp'n MSJ 2 n.1.) Interestingly, Edgecomb Development does not press the issue, instead focusing its arguments on the failure to record. In any event, the property at issue is the CEA, and publication of the notice of sale is not required for a UCC sale. *See* 11 M.R.S. §§ 9-1611, 9-1612 (2013).

[7] The statute does provide a procedure for correcting an error or omission in the recorded affidavit by petitioning to the Superior Court, but that procedure would not seem to apply to a defect in the timing of the recordation. *See* 14 M.R.S. § 6203-B (2013).

11

foreclosure, nor does it have any effect on an accompanying, appropriately noticed UCC sale. Notably, Edgecomb Development presents no legal authority in support of its position. The Court concludes that the December 2009 sale transferred all of Edgecomb Development's personalty to the Bank, and the subsequent corrective sale of the real estate in January of 2010 does not affect the validity of that transfer of personalty.

III. Edgecomb Development's claim to the TIF payments are barred by its release and res judicata

The Bank's final, alternative argument is that Edgecomb Development is foreclosed from claiming any entitlement to the TIF payments based on its release in the Prior Litigation and res judicata.

A. *The release in the Prior Litigation*

As previously noted, the parties resolved the Prior Litigation through a settlement agreement and release. Edgecomb Development and Bintliff released the Bank

> from and any all claims . . . of whatever kind or character, direct or indirect, whether known, unknown, or capable of being known, from the beginning of time through the date on which the last Party executes this Agreement, arising at law or in equity, by right of action or otherwise, that [Edgecomb Development or Bintliff] have, had, or may have had against the [Bank], including without limitation, express or implied, any and all claims relating to the Loan Documents, the Accounts or any other lender-borrower relationship between the Parties, the Bank's foreclosure of any property owned by Edgecomb [Development], any actions taken by the Bank with respect to any foreclosed property previously owned by Edgecomb [Development], the ownership and other rights of the Bank with respect to any foreclosed property previously owned by Edgecomb [Development] or that were or could have been asserted in the Litigation.

(S.S.M.F. ¶ 29; O.S.M.F. ¶ 29.) Edgecomb Development does not allege any ambiguity in the release, and the interpretation of an unambiguous release is a question of law. *See Shostak v. Shostak*, 2004 ME 75, ¶ 11, 851 A.2d 515.

When the final party executed the settlement agreement on October 19, 2011, (*see* Butler Aff. Exh. 12 at 11), the Bank had already sold and ultimately purchased the personalty

12

(including the CEA) and real estate of Edgecomb Development to satisfy Edgecomb Development's obligations under the Loans. Accordingly, the release prevents Edgecomb Development from challenging those sales because Edgecomb Development released any claim it had or may have had against the Bank related to the "any actions taken by the Bank with respect to any foreclosed properties previously owned by Edgecomb [Development], the ownership and other rights of the Bank with respect to any foreclosed property previously owned by Edgecomb [Development] or that were or could have been asserted in the Litigation." The claims were clearly in existence at the time the settlement agreement became effective, and the release bars any claim Edgecomb Development had regarding the legality or validity of the December 2009 and January 2010 sales. *See Shostak*, 2004 ME 75, ¶ 14, 851 A.2d 515.

Edgecomb Development makes arguments on why the right to prospective TIF payments, i.e., those payments which had not been made as of the date of the settlement agreement, is not encompassed in the release, but the Court does not find the arguments persuasive. They all are premised upon the CEA not being included within the personalty of Edgecomb Development that was sold in December 2009 (Opp'n MSJ 9-10), a premise that the Court has already rejected. Moreover, if the Bank and Edgecomb Development intended to exclude claims regarding the CEA from the releases they exchanged, the parties presumably would have included such language. *See Shostak*, 2004 ME 75, ¶ 14, 851 A.2d 515.

Edgecomb Development also suggested at oral argument that the dismissal of the Prior Litigation and the accompanying exchange of releases undid everything that preceded them, essentially as if those events—mainly the December 2009 sale of assets and the January 2010 sale of real estate—had never happened. As a result of the dismissal of the litigation between it and the Bank, according to Edgecomb Development, the rights that purportedly were sold in

13

December 2009 have reverted to Edgecomb Development, and the release given by the Bank prevents the Bank from challenging Edgecomb Development's right to the payments. The court disagrees—the December and January sales occurred independently of the court case, and were not undone or otherwise affected by the dismissal of the case. What the dismissal of the case and the accompanying exchange of releases did do was to extinguish the Bank's and Edgecomb Development's ability to challenge or reopen their past transactions. Moreover, if the parties had purported to undo either sale, their settlement would had to have said so.

B.      *Res judicata*

The component of res judicata applicable under the present circumstances is claim preclusion. *See Penkul v. Matarazzo*, 2009 ME 113, ¶ 7, 983 A.2d 375.

> Claim preclusion prevents relitigation if: (1) the same parties or their privies are involved in both actions; (2) a valid final judgment was entered in the prior action; and (3) the matters presented for decision in the second action were, or might have been litigated in the first action. To determine whether a claim is barred, [the court applies] a transactional test, examining the aggregate of connected operative facts that can be handled together conveniently for purposes of trial to determine if they were founded upon the same transaction, arose out of the same nucleus of operative facts, and sought redress for essentially the same basic wrong.

*Portland Water Dist. v. Town of Standish*, 2008 ME 23, ¶ 8, 940 A.2d 1097 (citation and quotation marks omitted).

The Prior Litigation was between the same parties, the Bank and Edgecomb Development, and it was dismissed with prejudice pursuant to M.R. Civ. P. 41(a)(1). The issue is whether claims regarding the CEA were litigated or could have been litigated in the Prior Litigation. Because the Edgecomb Defendants alleged in the Prior Litigation that they were misled regarding the assignment of the CEA and sought damages for the full value of the TIF agreement from the Bank, it is clear that any entitlement to future TIF payments either was litigated in the prior litigation or should have been litigated. Accordingly, any claim by

14

Edgecomb Development for TIF payments pursuant to the CEA, regardless of whether those payments had accrued, is barred by the doctrine of res judicata.

## CONCLUSION

Based on the foregoing analysis, SBM Property A, Inc., as the transferee of all of Edgecomb Development's personalty including its rights under the CEA, is the party entitled to receive the TIF payments currently held by the Town pending resolution of this case, and all future TIF payments by the Town as they accrue in accordance with the CEA.

IT IS HEREBY ORDERED:

1. The Bank of Maine's Motion for Summary Judgment, as adopted by Defendant SBM Property A. is hereby granted.

2. Pursuant to 14 M.R.S. § 5955, the court hereby declares and adjudges that Defendant SBM Property A, as transferee, holds and is entitled to all rights formerly held by Defendant Edgecomb Development, LLC under the Credit Enhancement Agreement (CEA) of July 18, 2005 between Plaintiff Town of Edgecomb and Edgecomb Development, LLC, including the right to receive funds now held by the Town reflecting TIF payments payable by the Town, and the right to receive all future TIF payments payable by the Town under the CEA, free and clear of any claim by Edgecomb Development, LLC.

3. Plaintiff Town of Edgecomb and Defendants The Bank of Maine and SBM Property A are awarded their costs as prevailing parties against Defendant Edgecomb Development. *See* 14 M.R.S. § 5962.

Pursuant to M.R. Civ. P. 79(a), the Clerk is directed to incorporate this Order and Judgment into the docket by reference.

Dated March 11, 2014

_____
A. M. Horton
Justice, Business and Consumer Court

Entered on the Docket: 3-11-14
Copies sent via Mail___ Electronically ✓

**Town of Edgecomb v. Edgecomb Development, LLC, Roger Bintliff, The Bank of Maine, and SBM Property A. Inc.**
**BCD-CV-13-38**


**Town of Edgecomb**
    **Petitioners / Plaintiffs**

        Counsel:                Erik Stumpfel, Esq.
                                84 Harlow St.
                                P.O. Box 1401
                                Bangor, ME 04402

**Edgecomb Development, LLC, Roger Bintliff,**
    **Respondents / Defendants**

        Counsel:                 John d. Clifford, Esq.
                                Joshua Klein-Golden, Esq.
                                5 Maple St.
                                P.O. Box 368
                                Lisbon Falls, ME 04252

**The Bank of Maine, and SBM Property A. Inc.**
    **Respondents / Defendants**

        Counsel:                 Mark A. Porada, Esq.
                                  Merrils Warf
                                254 Commercial St
                                Portland, ME 04101